OREGON ADVOCACY CENTER; Metropolitan Public Defender Services, Inc.; and A.J. Madison, Plaintiffs–Appellees,

v.

Bobby MINK, Director of the Department of Human Services, in his official capacity; and Stanley Mazur–Hart, Superintendent of Oregon State Hospital, in his official capacity, Defendants–Appellants.

No. 02–35530.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 11, 2002.

Filed March 6, 2003.

Richard D. Wasserman, Assistant Attorney General, Salem, OR, for the defendants-appellants.

Kathleen L. Wilde, Oregon Advocacy Center, and Spencer M. Neal, Oregon Law Center, Portland, OR, for the plaintiffs-appellees.

Before: T.G. NELSON, GRABER and FISHER, Circuit Judges.

FISHER, Circuit Judge.

Oregon, in recognition of the constitutional rights of mentally incapacitated persons charged with a crime, commendably has enacted statutory procedures for the identification and restorative treatment of such persons so that their guilt or innocence can be determined in a trial. This case presents the question of what happens when the state mental hospital (Oregon State Hospital or "OSH"), which is charged with evaluating and treating mentally incapacitated defendants, refuses to accept such defendants on a timely basis. Plaintiffs contend that OSH's delays in accepting mentally incapacitated defendants violate those defendants' substantive and procedural due process rights. OSH argues that it is the county jails' responsibility to maintain and treat incapacitated defendants until OSH has an open bed. After a bench trial, the district court agreed with the plaintiffs and entered an injunction requiring OSH to admit defendants within seven days of a trial court's finding of their incapacity to proceed to trial. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## BACKGROUND

### I. Parties

Plaintiffs (appellees here) include A.J. Madison, a mentally incapacitated criminal defendant who was detained in a county jail while awaiting transfer to OSH, and two nonprofit organizations that represent such defendants. Plaintiff Oregon Advocacy Center ("OAC") is a federally authorized and funded law office established under the Protection and Advocacy for Mentally Ill Individuals Act of 1986 ("PAMII"), 42 U.S.C. §§ 10801–10851. OAC represents the rights of people with disabilities, including mentally ill individuals. Plaintiff Madison is one of OAC's constituents and requested that OAC bring this suit on his behalf. Plaintiff Metropolitan Public Defender Services, Inc. ("MPD") represents indigent criminal defendants in two Oregon counties.

These plaintiffs sued Stanley Mazur–Hart, the Superintendent of the Oregon State Hospital, and Bobby Mink, the Director of Oregon's Department of Human Services, in their official capacities (collectively referred to as "OSH" in this opinion). The plaintiffs alleged that OSH was violating mentally incapacitated defendants' due process rights by unreasonably delaying such defendants' transfer from county jails to OSH for treatment.

### II. The Problem

Under Oregon law, state circuit (trial) courts may, before or during trial, find a criminal defendant to be incapacitated as a result of a mental disease or defect such that the defendant is unable to assist and cooperate with defense counsel or participate in the defense.[1] Such a finding trig-

---

**1.** Oregon Revised Statute ("ORS") § 161.360 provides:

(1) If, before or during the trial in any criminal case, the court has reason to doubt

gers a process designed to evaluate, treat and restore the defendant's mental health so that judicial proceedings may resume. "If [a] court determines that [a criminal] defendant lacks fitness to proceed [to trial], the proceeding against the defendant shall be suspended ... and the court shall commit the defendant to the custody of the superintendent of a state mental hospital designated by the Department of Human Services...." Oregon Revised Statute ("ORS") § 161.370(2). The Oregon State Hospital is the only "state mental hospital" that has been designated under this statute.

OSH is required to evaluate a defendant committed to its custody within 60 days of the defendant's arrival to determine "whether there is a substantial probability that, *in the foreseeable future, the defendant will have the capacity to stand trial.*" ORS § 161.370(3) (emphasis added).[2] If, at any time, the defendant becomes capable of standing trial or will never have that capacity, OSH must immediately so notify the court. ORS § 161.370(4). Within 90 days of the defendant's arrival, OSH must notify the court whether the defendant has the capacity to stand trial and, if not, whether there is a substantial probability that the defendant will gain or regain that capacity in the foreseeable future. *Id.* If OSH determines that such a probability exists, "the defendant shall remain in [OSH's] custody where the defendant shall receive treatment designed for the purpose of enabling the defendant to gain or regain capacity." ORS § 161.370(5).

the defendant's fitness to proceed by reason of incapacity, the court may order an examination in the manner provided in ORS 161.365.
(2) A defendant may be found incapacitated if, as a result of mental disease or defect, the defendant is unable:
(a) To understand the nature of the proceedings against the defendant; or

After a bench trial, the district court found that, during 2001 and early 2002, incapacitated criminal defendants spent on average about one month in county jails before OSH accepted them for the requisite evaluation and treatment. In many cases, defendants had to wait two, three or even five months. The court also spelled out in a series of factual findings—for the most part undisputed by OSH—the harms suffered by defendants who are relegated to a wait-list status and remain in jail until OSH has room for them. We set out the most relevant undisputed findings here:

9. Jails can provide medication management for people who are willing to take medications, but cannot administer medication involuntarily, except in a life-threatening emergency. When resources permit, treatment for "unfit to proceed" defendants may possibly include basic clinical psychiatry and intervention. Such treatment is designed to stabilize the inmate. However, some inmates, particularly those with personality disorders, refuse or do not respond to medication, and do not otherwise respond to the treatment the jails can provide.

10. None of the jails in which these persons are held is able to provide treatment designed to restore a person found unfit to proceed to competency. People found unfit to proceed are often overtly psychotic and require special housing or segregation. They are unpredictable and disruptive, taking up valuable resources needed for the care of other

(b) To assist and cooperate with the counsel of the defendant; or
(c) To participate in the defense of the defendant.

**2.** Technically, the Superintendent—currently defendant Stanley Mazur–Hart—is the statutorily responsible person, but we shall refer to OSH for convenience.

inmates. If they refuse to take medications, they often decompensate rapidly. They often are confined in their cells for 22 to 23 hours a day because of their behavior. This exacerbates their mental illness.

11. Necessarily, the jails' only system for controlling inmates is disciplinary, which is behavior-driven. Such a system is ineffective for mentally ill persons, and possibly harmful.

12. Unlike the county jails, OSH has the capacity to treat a person's mental illness. Each of the units housing persons found unfit to proceed is staffed by a full-time psychiatrist, a psychologist, a mental health specialist, a recreation counselor, a social worker, a mental health technician and nurses.

13. In addition to assessment, medication evaluation and management, and individual and group psychotherapy, OSH provides legal skills training three times a week to assist patients in learning about the law, pleas, and returning to court. This treatment is designed to enable a person to regain fitness to proceed to trial.

17. .... This population has a high suicide risk, and psychosis can be an emergency requiring immediate treatment.

18. .... Depriving [persons deemed unfit to proceed] of necessary medical treatment increases the likelihood that they may decompensate and suffer unduly. The delays also hamper efforts to provide effective representation regarding their criminal prosecution.

19. .... [A]s the client spends weeks and months in jail awaiting hospitalization, th[e] evaluation [required by state law] is delayed.... [F]or people declared to be unable to aid and assist, delays in the subsequent evaluative process can postpone the opportunity for a trial for much longer than 60 days.

20. The jails have the capacity to transport inmates to a treatment facility within 24 hours. The reason they do not transport the inmates is because defendants refuse to accept them.

## III. The Suit

Plaintiffs sued OSH on March 19, 2002, seeking injunctive and declaratory relief. OAC and MPD both brought suit on behalf of constituents who suffer injury as a result of OSH's failure to provide them timely treatment. MPD also sued in its own right. As of the date of filing, there were seven persons, including Madison, who had been declared unfit and who were being held in county jails awaiting transfer to OSH. As of March 25, 2002, there were 11 such persons including Madison. Madison was held in jail for a total of 23 days before being admitted to OSH on March 28, 2002.

The district court held a bench trial on April 8, 2002, and issued its findings of fact and conclusions of law on May 9. It held that (1) OAC had standing to sue on behalf of its constituents, mentally incapacitated criminal defendants, and MPD had standing to sue in its own right; and (2) OSH was violating the incapacitated defendants' Fourteenth Amendment due process rights by unreasonably detaining them in county jails that lack the facilities to treat and restore the defendants' mental health. The district court entered an injunction requiring OSH to admit mentally incapacitated defendants within seven days of the judicial finding of their incapacity to proceed to trial.

Thereafter, OSH moved to stay the injunction pending appeal and to clarify and modify the injunction so that the seven-day period would begin to run upon OSH's receipt of notice of a finding of unfitness. On May 27, 2002, the district court denied both motions. OSH timely appealed. On

June 13, 2002, this court granted OSH's emergency motion to stay the injunction pending appeal.[3]

## IV. Issues

OSH does not dispute that mentally ill persons who are accused of crime have constitutionally protected due process rights that the state is obliged to honor. Nor does OSH seriously contest that jails are inferior to OSH in their ability to evaluate and treat mentally ill defendants, or that defendants denied needed care are harmed thereby. Rather, OSH's primary defenses are that (a) neither OAC nor MPD has standing to sue and (b) in any event, liability lies not with OSH—which under its reading of the Oregon statute has no duty to mentally ill defendants until it has a bed available and actually takes custody of them—but with the county jails who have the legal duty to maintain and care for the defendants until OSH can accept them. We address these and other of OSH's arguments below.

## DISCUSSION

### I. Justiciability

#### A. Standing

■ OSH argues that plaintiffs OAC and MPD lack standing to bring this suit. Standing is a question of law, which we review de novo. *Bernhardt v. County of Los Angeles*, 279 F.3d 862, 867 (9th Cir. 2002).

■ The doctrine of standing limits federal judicial power and has both constitutional and prudential components. *See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 551, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996). Under Article III, Section 2 of the Constitution, federal judicial power extends only to cases or controversies, requiring "as an 'irreducible minimum' that there be (1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." *Id.* "The essence of the standing question, in its constitutional dimension, is whether the plaintiff has alleged such a personal stake in the outcome of the controversy [as] to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 260–61, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (alteration in original) (internal quotation marks omitted).

■ "Supplementing these constitutional requirements, the prudential doctrine of standing has come to encompass several judicially self-imposed limits on the exercise of federal jurisdiction." *United Food*, 517 U.S. at 551, 116 S.Ct. 1529 (internal quotation marks omitted). These judicially self-imposed limits include "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). The prudential component of standing precludes the exercise of federal jurisdiction even where the Constitution's "irreducible minimum" requirements have been met. Unlike the constitutional requirements, however, prudential limits on the exercise of federal jurisdiction may be abrogated by Congress. *United Food*, 517 U.S. at 551,

---

3. As noted in the conclusion to this opinion, the order of stay pending appeal is hereby dissolved.

555–58, 116 S.Ct. 1529. Together, the constitutional and prudential components of standing ensure that plaintiffs possess "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

The district court relied on the principles of "associational" standing to conclude that OAC has standing to represent its constituents—that is, "to represent the interests of persons who are presently or may in the future be unfit to stand trial" for purposes of obtaining injunctive or declaratory relief. *See, e.g., United Food,* 517 U.S. at 551–58, 116 S.Ct. 1529; *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 342, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). As for MPD, the district court concluded that MPD has standing to represent its own interests because of injury it suffers from OSH's practice of delaying the admission of mentally impaired defendants.

OSH argues that OAC lacks associational standing and that both OAC and MPD lack standing because they have failed to show a causal connection between their injuries and OSH's conduct. "We need only find that one petitioner has standing to allow a case to proceed." *Pub. Citizen v. Dep't of Transp.,* 316 F.3d 1002, 1014–15 (9th Cir.2003). Because the injunction from which OSH appeals is statewide, and because MPD serves only two counties whereas OAC serves the entire state, we first address OAC's standing and, as it turns out, need not address MPD's.

*1. OAC's Associational Standing*

■ The doctrine of associational standing permits an organization to "sue to redress its members' injuries, even without a showing of injury to the association itself." *United Food,* 517 U.S. at 552, 116 S.Ct. 1529. Whether an organization may assert a claim on behalf of its members triggers both constitutional and prudential concerns. As explained in *Hunt:*

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

432 U.S. at 343, 97 S.Ct. 2434. Although the first two requirements are constitutional in nature, the third is prudential. *United Food,* 517 U.S. at 555–57, 116 S.Ct. 1529.

OSH contends that OAC fails the first and third prongs of the *Hunt* test because OAC's constituents are not "members" of OAC and OAC's claim requires the participation of individual incapacitated criminal defendants. OSH's challenge under *Hunt's* first prong thus raises a *constitutional* standing requirement, whereas its challenge under the third prong raises only a *prudential* standing requirement.

OAC attempts to short-circuit OSH's standing arguments by contending that Congress, in enacting PAMII, statutorily conferred standing on organizations such as OAC as a matter of law. Although we agree that PAMII is relevant to OAC's standing, it cannot override constitutional standing requirements.

■ OAC correctly points out that Congress recognized that "individuals with mental illness are vulnerable to abuse and serious injury," and enacted PAMII to "ensure that the rights of individuals with mental illness are protected" and to assist states in establishing advocacy systems to

"protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes." 42 U.S.C. § 10801(a)(1), (b)(1), (b)(2)(A). Under PAMII, protection and advocacy systems such as OAC are authorized to "pursue . . . legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State." *Id.* § 10805(a)(1)(B). Criminal defendants found unfit to proceed to trial do suffer from mental illness, and OAC is attempting to pursue legal remedies to ensure the protection of such individuals. Therefore, we accept OAC's argument that Congress intended to confer standing to pursue suits like this one on organizations like OAC. Nevertheless, OAC's argument that it therefore *necessarily* has standing must fail.

The question whenever Congress attempts to confer standing is whether the particular obstacle that Congress has attempted to remove is "constitutional and absolute, or prudential and malleable by Congress." *United Food,* 517 U.S. at 551, 116 S.Ct. 1529. OSH's standing challenges under the first prong of *Hunt* and under causation (addressed in section I.A.2 below) concern standing requirements that are "constitutional and absolute" in nature. Thus PAMII—although relevant to the standing analysis—does not definitively answer the question whether OAC has standing.

We therefore turn to OSH's challenges to OAC's associational standing. First, OSH claims OAC fails the first prong of *Hunt* because mentally incapacitated defendants, although constituents of OAC, are neither "members" of OAC nor the functional equivalent of members. Second, OSH argues that OAC fails the third prong of *Hunt* because its claims require the participation of the individual incapacitated defendants. We address each argument in turn.

■ Put in starkest terms, OSH's membership argument is that because "individuals with mental illness [do not] actually control OAC's activities and finances," OAC cannot claim standing to represent their interests. In constitutional terms, the essence of OSH's position is that without a direct membership linkage to incapacitated defendants, OAC cannot rely on injuries to those mentally ill defendants to meet the injury in fact requirement and establish the *personal* stake in the outcome of the litigation that the Constitution demands.

We think OSH's membership argument is overly formalistic. Given OAC's statutory mission and focus under PAMII, its constituents—in this case, the mentally incapacitated defendants—are the functional equivalent of members for purposes of associational standing. In so holding, we agree with the only other circuit to have addressed the question. *See Doe v. Stincer,* 175 F.3d 879, 886 (11th Cir.1999) (holding that a PAMII organization "may sue on behalf of its constituents like a more traditional association may sue on behalf of its members").

Our holding also comports with *Hunt.* In *Hunt,* the Supreme Court upheld the standing of the Washington State Apple Advertising Commission, a state agency, to challenge a North Carolina statute that imposed labeling restrictions on Washington state apple growers and dealers. *Hunt,* 432 U.S. at 345, 97 S.Ct. 2434. North Carolina argued that the Commission was not a traditional voluntary membership organization asserting claims of its members, but rather a state agency that was seeking to assert claims on behalf of apple growers and dealers, who simply formed its constituency. Thus the Commission purportedly lacked the "personal

stake" in the litigation needed to establish constitutional standing. *Id.* at 341–43, 97 S.Ct. 2434. The Court concluded otherwise. The Court noted first that "[t]he Commission, while admittedly a state agency, for all practical purposes, performs the functions of a traditional trade association representing the Washington apple industry." *Id.* at 344, 97 S.Ct. 2434. The Court found, moreover, that:

> while the apple growers and dealers are not "members" of the Commission in the traditional trade association sense, they possess all of the indicia of membership in an organization. They alone elect the members of the Commission; they alone may serve on the Commission; they alone finance its activities, including the costs of this lawsuit, through assessments levied upon them.

*Id.* at 344–45, 97 S.Ct. 2434. Finally, the Court noted that "the interests of the Commission itself may be adversely affected by the outcome of th[e] litigation," because the annual assessments paid to the Commission depend on the size of the market for apples grown and packaged as "Washington Apples." *Id.* at 345, 97 S.Ct. 2434. Refusing to "exalt form over substance to differentiate between the Washington Commission and a traditional trade association representing the individual growers and dealers who collectively form its constituency," the Court held that the Commission had standing as the functional equivalent of such a trade association. *Id.*

Similarly, we conclude that, for the purpose of determining whether OAC had standing to sue on behalf of incapacitated criminal defendants, OAC is the functional equivalent of a voluntary membership organization. *Accord Stincer,* 175 F.3d at 885–86. Like the Commission in *Hunt,* as OSH implicitly concedes, OAC serves a specialized segment of Oregon's community: the disabled in general, including the mentally ill and, more specifically, incapacitated criminal defendants. Those groups are the primary beneficiaries of OAC's activities, "including the prosecution of this kind of litigation." *Hunt,* 432 U.S. at 344, 97 S.Ct. 2434.

Admittedly, the constituents of OAC do not have all the indicia of membership that the *Hunt* apple growers and dealers possessed. OAC is funded primarily by the federal government, and not by its constituents. OAC's constituents are not the only ones who choose the leadership of OAC, and they are not the only ones who may serve on OAC's leadership bodies. Nevertheless, OAC's constituents do possess many indicia of membership—enough to satisfy the purposes that undergird the concept of associational standing: that the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a "personal stake in the outcome of the controversy." *See Vill. of Arlington Heights,* 429 U.S. at 261, 97 S.Ct. 555 (internal quotation marks omitted).

Under PAMII, the governing board of an organization like OAC "shall be composed of ... members ... who broadly represent or are knowledgeable about the needs of the clients served by the system," where such members are defined to include "individuals who have received or are receiving mental health services and family members of such individuals." 42 U.S.C. § 10805(c)(1)(B). Also, a protection and advocacy system such as OAC must:

> establish an advisory council ... which shall include ... individuals who have received or are receiving mental health services, and family members of such individuals, and at least 60 percent the membership of which shall be comprised of individuals who have received or are receiving mental health services or who are family members of such individuals; and ... which shall be chaired by an individual who has received or who is

receiving mental health services or is a family member of such an individual. *Id.* § 10805(a)(6)(B-C). Furthermore, PA-MII provides that a system such as OAC shall "establish a grievance procedure for clients or prospective clients of the system to assure that individuals with mental illness have full access to the services of the system and ... to assure that the ... system is operating in compliance with the provisions" of PAMII. *Id.* § 10805(a)(9).

OAC's executive director, Robert Joondeph, provided undisputed testimony that people with disabilities constitute a majority of OAC's board of directors and that individuals who had received or were receiving mental health services, or family members of such individuals, compose more than 60 percent of the advisory council for OAC's PAMII-funded program. Together, these circumstances suggest that, "[m]uch like members of a traditional association, the constituents of the Advocacy Center possess the means to influence the priorities and activities the Advocacy Center undertakes." *Stincer*, 175 F.3d at 886. "In a very real sense, therefore," OAC represents those who suffer from mental illness, including incapacitated criminal defendants, and "provides the means by which they express their collective views and protect their collective interests." *Hunt*, 432 U.S. at 345, 97 S.Ct. 2434.

Like the Commission's interests in *Hunt*, OAC's interests "may be adversely affected by the outcome of this litigation." *Id.* at 345, 97 S.Ct. 2434. Although OAC has no direct financial stake in the outcome of this litigation—as the Apple Advertising Commission did in *Hunt*—OAC has a statutorily mandated interest in the timely transfer of mentally incapacitated defendants to OSH. To the extent OAC

devotes resources to helping such persons obtain timely treatment, the other needs of OAC's constituents may go unmet. *See Stincer*, 175 F.3d at 886 n. 5 (noting that the plaintiff Advocacy Center's clients have an interest in access to records and that, "to the extent that the Advocacy Center devotes its work to assisting clients in obtaining records, other needs may go unmet"). This shared interest " 'assure[s] that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' " *Hunt*, 432 U.S. at 345, 97 S.Ct. 2434 (quoting *Baker*, 369 U.S. at 204, 82 S.Ct. 691). We hold, therefore, that "[u]nder the circumstances presented here, it would exalt form over substance," to conclude that OAC's constituents lack sufficient indicia of membership to justify OAC's Article III standing. *Id.*

 Having determined that OAC's constituents are the functional equivalent of members, we must further determine under the first prong of *Hunt* whether at least one of OAC's constituents would have had "standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association." *United Food*, 517 U.S. at 555, 116 S.Ct. 1529. OSH does not dispute that at the time the complaint was filed, at least seven OAC constituents, including Madison, the individual plaintiff, were being held in county prisons awaiting transfer to OSH and thus had standing to sue.[4] Thus, the first prong of *Hunt* is satisfied.

 OSH also argues that OAC lacks standing under the third prong of *Hunt* because OAC's claim requires the participation of the individual incapacitated defendants. We reject this argument as

---

4. OSH argues instead that the potential claims of these seven individuals became moot by the time of trial because by that time their transfer to OSH had come through. *See* section I.B, *infra.*

well. Although, as explained above, the Constitution constrains Congress' ability to confer standing, Congress can confer standing where the only obstacles are "judicially fashioned and prudentially imposed." *United Food,* 517 U.S. at 551, 558, 116 S.Ct. 1529. The third prong of *Hunt,* which requires that associations have standing only when "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit," 432 U.S. at 343, 97 S.Ct. 2434, is one such prudential, as opposed to constitutional, requirement of standing. *United Food,* 517 U.S. at 557, 116 S.Ct. 1529 ("[T]he third prong of the associational standing test is best seen as focusing on these matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution."); *see also Cent. Delta Water Agency v. United States,* 306 F.3d 938, 951 n. 9 (9th Cir. 2002) (noting that unlike the first two *Hunt* factors, "the third factor is 'merely prudential,' and designed to promote efficiency in adjudication"). As discussed above, Congress clearly intended PAMII to confer standing on organizations such as OAC to litigate on behalf of those suffering from mental illness. In *United Food,* the Supreme Court concluded: "Because Congress authorized the union to sue for its members' damages, and because the only impediment to that suit is a general limitation, judicially fashioned and prudentially imposed, there is no question that Congress may abrogate the impediment." 517 U.S. at 558, 116 S.Ct. 1529. Here, we hold

that because Congress authorized advocacy and protection organizations like OAC to sue on behalf of those suffering from mental illness, and because the only impediment to such a suit is a prudential one, Congress may abrogate the impediment.

The question, then, is whether Congress did abrogate the prudential impediment to OAC's standing. In *United Food,* the Court held that Congress had "without doubt" abrogated the third prong of the *Hunt* test by specifically authorizing the union to sue for its members' damages. *Id.* at 548–49, 558, 116 S.Ct. 1529. In the statute at issue in *United Food,* Congress explicitly authorized unions to sue on behalf of their members when an employer fails to give workers 60 days' notice before a plant closing or mass layoff as the statute required. *Id.* at 549, 116 S.Ct. 1529. PAMII, like the WARN Act at issue in *United Food,* explicitly authorizes organizations such as OAC to bring suit on behalf of their constituents, who include criminal defendants declared unfit to proceed. PAMII provides that "[a] system established in a State under ... section 10803 of this title to protect and advocate the rights of individuals with mental illness shall ... have the authority to ... pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State."[5] 42 U.S.C. § 10805(a)(1)(B). We hold that in light of the role Congress assigned by statute to advocacy organizations such as OAC, Congress abrogated the third prong of the *Hunt* test.[6]

---

**5.** PAMII provides that "[p]rior to instituting any legal action in a Federal or State court on behalf of a[sic] individual with mental illness, an eligible [organization] ... shall exhaust in a timely manner all administrative remedies where appropriate." 42 U.S.C. § 10807(a). Such an organization may bring suit without exhausting administrative remedies if the organization determines that such remedies will

not resolve the matter within a reasonable time, or if the suit is brought "to prevent or eliminate imminent serious harm to a[sic] individual with mental illness." *Id.* § 10807(b).

**6.** Because we so hold, we need not reach the question whether OAC's claim would otherwise require the participation of individual incapacitated criminal defendants.

## 2. OAC's Standing: Causation

■ Finally, OSH argues that OAC has failed to establish the second constitutional requisite of standing—a causal connection between its injuries and OSH's conduct. Specifically, OSH argues that any injury to incapacitated defendants and OAC is not fairly traceable to OSH's actions because, before OSH has beds available and actually takes custody of incapacitated criminal defendants, Oregon *counties*, not OSH, have the duty to provide these defendants with constitutionally adequate care. If the county jails were providing adequate treatment, then incapacitated criminal defendants and OAC would not suffer any injury or adverse effect. Therefore, even if the delay in treatment causes injury, OSH is not the cause of the delay. We disagree.

■ Under Oregon law, OSH has the duty to accept and treat mentally incapacitated criminal defendants. The question is whether that duty resides in or shifts to county jailers until such time as OSH has an available bed for and accepts the defen-dant. The answer is found in the plain meaning of the governing statute.

> In interpreting a statute, the court's task is to discern the intent of the legislature. To do that, the court examines both the text and context of the statute.... [T]he text of the statutory provision itself is the starting point for interpretation and is the best evidence of the legislature's intent.

*Portland Gen. Elec. Co. v. Bureau of Labor & Indus.*, 317 Or. 606, 859 P.2d 1143, 1145–46 (Or.1993) (internal citations omitted). "Words of common usage should be given their plain, natural and ordinary meaning." *Carlson v. Myers*, 327 Or. 213, 959 P.2d 31, 36 (1998) (internal quotation marks omitted). The context of the statutory provision at issue includes other provisions of the same statute and other related statutes, as well as prior versions of the same statute. *Id.; Portland Gen. Elec.*, 859 P.2d at 1146. Only if the legislature's intent is unclear from the text and context of the statute should courts look to legislative history. *Portland Gen. Elec.*, 859 P.2d at 1146.[7]

---

7. The Oregon legislature recently amended ORS § 174.020, which governs the construction of statutes by the Oregon courts. *See* 2001 Or. Laws 438 § 1. The amendments apply to the present case because the complaint was filed after the amendments' effective date of June 18, 2001. *See id.* §§ 2–3. They provide that "a court shall pursue the intention of the legislature if possible," that "a party may offer the legislative history of the statute" to assist the court in statutory construction, that "[a] court may limit its consideration of legislative history to the information that the parties provide" and that "[a] court shall give the weight to the legislative history that the court considers to be appropriate." *Id.* § 1.

The Oregon appellate courts have not addressed whether these amendments have any effect on *Portland General Electric's* framework for statutory interpretation and the parties have not raised the issue. Without deciding the question, we assume that the *Portland General Electric* framework remains control-ling. Even if the amended statute somehow alters the role of legislative history in that framework, the outcome in this case would remain unchanged.

The limited legislative history provided by the parties is inconclusive but tends to support rather than controvert the plain meaning of the statute's text. OSH selectively and inaccurately paraphrases Chairperson Bryant of the Senate Judiciary Committee as stating that "while [an incapacitated defendant] remains in the county's custody the county pays for the person's care *and treatment*." (Emphasis added.) According to the legislative history, however, Chairperson Bryant discussed "custodial care," not treatment. *Hearings on H.B. 2436A Before the Senate Judiciary Comm.*, Tape 62B at 178 *et seq.* (June 21, 1999). No one doubts that the county jails are financially responsible for the temporary incarceration of incapacitated defendants who are in the jails' de facto custody.

The legislative history supports the view that OSH is the only entity capable of provid-

Here, the Oregon legislature's intent is clear from the text of the statute. The plain meaning of the text is unambiguous. ORS § 161.370(2) provides in relevant part:

> If the court determines that the defendant lacks fitness to proceed, the proceeding against the defendant shall be suspended ... and the court *shall commit the defendant to the custody of the superintendent of a state mental hospital designated by the Department of Human Services or shall release the defendant on supervision for so long as such unfitness shall endure.* The court may release the defendant on supervision if it determines that care other than commitment for incapacity to stand trial would better serve the defendant and the community.

(Emphasis added.) OSH is the only designated state mental hospital. Significantly, the statute makes no mention of any intermediary, county jail or otherwise, to whom the court can commit a mentally incapacitated defendant before either committing the defendant to OSH or releasing the defendant on supervision.[8] By statute, therefore, the court has only two alternatives: it can commit the defendant to OSH or release the defendant on supervision. There is no middle ground.

A fair reading of the statute's text leads to the conclusion that it is aimed directly at keeping mentally incompetent defendants out of county jails, not at conferring responsibility on those jails for interim treatment. OSH's statutory duty is triggered whenever a court decides to commit a defendant to OSH rather than release the defendant.

OSH argues that a former version of ORS § 161.370, which was passed in 1999 but which expired at the end of 2001 due to a sunset provision, reflects a deliberate decision by the Oregon legislature to make counties responsible for the care and treatment of incapacitated criminal defendants until OSH accepts them. As we have said, the prior version of the statute is part of its context under Oregon jurisprudence, but the 1999 statute does not detract from our reading of the current law.

The pre–1999 version of the statute resembled the current version. It provided:

> When a court determines that a defendant lacks fitness to proceed and commits the defendant to the custody of the superintendent of a state mental hospital or other treatment facility under subsection (2) ... the defendant shall be transported to the hospital or treatment facility *as soon as practicable. Transport shall be completed within seven days after the court's determination unless doing so would jeopardize the health or safety of the defendant or others. While*

---

ing adequate treatment to incapacitated defendants and that OSH must, therefore, accept them within a matter of days, if not immediately. Mazur–Hart testified that county jails can provide only "minimal types of treatment" such as continuation of medication, and that some county jails have no mental health services at all. *Hearings on H.B. 2436 Before the House Judiciary Comm.,* Tape 61B at 270 *et seq.* (March 2, 1999). Chairperson Mannix of the House Judiciary Committee, in discussing whether OSH should be required to accept incapacitated defendants in three or six days, opined that incapacitated defendants "may be better off in an overcrowded situation at [OSH] while receiving treatment, than in the local jail." *Id.* at 387. Representative Hansen stated that OSH's delay in accepting incapacitated criminal defendants should not "drag on" any longer than six days. *Id.,* Tape 62B at 049 *et seq.*

In short, the legislative history is simply insufficient to support OSH's position that the legislature intended county jails to treat incapacitated criminal defendants indefinitely until OSH accepts them.

**8.** The option of supervised release does not contemplate commitment to a county jail.

*awaiting transport,* the defendant shall receive the custody, care and treatment necessary to ensure the defendant's health and safety.

ORS § 161.370(3) (1999) (emphasis added).

In 1998, a state fire marshal and health care accreditation organizations had cited OSH for overcrowding. The Oregon legislature revised ORS § 161.370 temporarily to give OSH an opportunity to address that problem. The legislature's decision in 2001 to restore the statute to its pre–1999 version, excising all references to periods of delay and conditions on transfer to OSH, suggests that the legislature intended what the statutory text now provides: courts are either to commit incapacitated defendants to OSH (not to county jails) or release them under supervision. The sun-setting of the old version also can be understood as OSH urges, as a legislative signal that there now is no time limit on OSH's taking custody of incapacitated criminal defendants, so that county jails must care for them in the interim. But the historical context of ORS § 161.370 by no means compels OSH's interpretation. Because the historical context can be read either way, we interpret the current text to mean what it says: the trial court may either commit an incapacitated defendant to the custody of OSH or may release such a defendant under supervision. Under the first option, OSH has the correlative duty to accept custody.

We therefore conclude that under Oregon law, it is not the counties but OSH that has the duty to accept and treat incapacitated defendants once they have been certified as such by a circuit court. Consequently, OSH's argument that OAC lacks standing for want of a causal link between its injuries and OSH's untimely acceptance of incapacitated defendants must fail.

In sum, OAC meets the constitutional requirements for standing, and prudential requirements pose no obstacle. OAC has standing to sue on behalf of its constituents—the mentally incapacitated defendants.

**B. Mootness**

 OSH also challenges our jurisdiction over OAC's claim on the ground of mootness. Mootness is a question of law, which we review de novo. *Wade v. Kirkland,* 118 F.3d 667, 669 (9th Cir.1997). OSH argues that OAC's claim is moot because all seven persons held in county jails awaiting admission to OSH at the time the action was filed were in fact admitted to OSH by the time the trial began. OSH claims that the individuals' admittance to OSH mooted not only Madison's claim, but also OAC's claim on his and the six other individuals' behalf. We disagree.

 "Mootness can be characterized as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Cook Inlet Treaty Tribes v. Shalala,* 166 F.3d 986, 989 (9th Cir.1999) (internal quotation marks omitted); *cf. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 189–92, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (noting that this way of describing mootness is not comprehensive). Thus, "[a]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Bernhardt,* 279 F.3d at 871. "Generally, an action is mooted when the issues presented are no longer live and therefore the parties lack a legally cognizable interest for which the courts can grant a remedy." *Alaska Ctr. for Env't v. United States Forest Serv.,* 189 F.3d 851, 854 (9th Cir. 1999); *see also Clark v. City of Lakewood,* 259 F.3d 996, 1011 (9th Cir.2001). "The party asserting mootness has the heavy burden of establishing that there is no

effective relief remaining for a court to provide." *Tinoqui–Chalola Council of Kitanemuk & Yowlumne Tejon Indians v. United States Dep't of Energy,* 232 F.3d 1300, 1303 (9th Cir.2000). We note the "flexible character of the Art. III mootness doctrine" and that "justiciability is not a legal concept with a fixed content or susceptible of scientific verification." *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 400–01, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) (internal quotation marks omitted).

OAC's claims for relief continue to present a live controversy for two reasons. First, the record reflects that the detention of incapacitated criminal defendants for weeks or months in Oregon county jails is an ongoing, pervasive and systemic problem. OSH has proffered no evidence to suggest that this problem has ceased and has conceded facts that strongly suggest the contrary. As the district court found, and as OSH concedes, during 2001 and early 2002 incapacitated criminal defendants spent on average about one month in county jails before OSH accepted them for the requisite evaluation and treatment. In many cases, defendants had to wait two, three or even five months. As of March 25, 2002, the hearing date for plaintiffs' motions for a temporary restraining order and a preliminary injunction, OSH had a list of 11 such defendants awaiting transport to OSH. In light of the record and of OSH's failure to proffer contrary evidence, we must assume that the detention of incapacitated criminal defendants in Oregon county jails for weeks or months continues to occur.

Although this is not a class action, the circumstances here are analogous to those found in class action cases where, because of the inherently transitory nature of the claims, the trial court does not have enough time to rule on a motion for class certification before the proposed representative's individual interest expires. *See Gerstein v. Pugh,* 420 U.S. 103, 110–11 n. 11, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). Like the present case, *Gerstein* was an action challenging pretrial detention conditions. In *Gerstein,* the Supreme Court "assumed that the named plaintiffs were no longer in custody awaiting trial at the time the trial court certified a class of pretrial detainees. There was no indication that the particular named plaintiffs might again be subject to pretrial detention." *Geraghty,* 445 U.S. at 399, 100 S.Ct. 1202 (interpreting *Gerstein* ).[9] Nevertheless, the Court held that the case was not moot, because:

> The length of pretrial custody cannot be ascertained at the outset, and it may be ended at any time by release on recognizance, dismissal of the charges, or a guilty plea, as well as by acquittal or conviction after trial. *It is by no means certain that any given individual, named as plaintiff, would be in pretrial custody long enough for a district judge to certify the class. Moreover, in this case the constant existence of a class of persons suffering the deprivation is certain.* The attorney representing the named respondents is a public defender, and we can safely assume that he has other clients with a continuing live interest in the case.

*Gerstein,* 420 U.S. at 110–11 n. 11, 95 S.Ct. 854 (emphasis added). Here, as in *Gerstein,* the length of detention in the county jail is short enough that any individual

---

**9.** The Court was referring to the "capable of repetition, yet evading review" exception to mootness, which "applies only when (1) the challenged action is too short in duration to be fully litigated before cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Cole v. Oroville Union High Sch. Dist.,* 228 F.3d 1092, 1098 (9th Cir.2000).

detainee's claim would probably become moot before trial. In addition, the constant existence of OAC constituents suffering the deprivation is certain.

The second reason why OAC's claims are not moot is that OAC challenges not only OSH's delay in admitting the seven individuals held in county jails at the time the suit was brought, but also *the policy that results in such delays*. As we noted earlier, OSH does not dispute its policy of turning away mentally incapacitated defendants, nor does it dispute its continuing failure to devote resources sufficient to provide an adequate number of beds. Furthermore, OSH has taken the categorical legal position that it is not responsible for ensuring the timely admission of incapacitated criminal defendants. The continued and uncontested existence of the policy that gave rise to OAC's legal challenge forecloses OSH's mootness argument. *See Ukrainian–Am. Bar Ass'n v. Baker*, 893 F.2d 1374, 1377 (D.C.Cir.1990).

In *Ukrainian–American Bar Ass'n*, the court held that even if the particular situation that precipitates an organization's challenge to a government policy resolves itself at some point during the litigation, the case is not moot as long as the continued existence of the policy is uncontested. *Id.* That case involved a suit brought by the Ukrainian–American Bar Association ("UABA") to require the Immigration and Naturalization Service to furnish Soviet and East Bloc aliens seeking asylum with written notification of the UABA's offer to provide them free legal services. *Id.* at 1376. The case arose after a Ukrainian merchant seaman, Myroslav Medvid, jumped off a Soviet grain ship in the Mississippi River, allegedly "for political and moral reasons." *Id.* (internal quotation marks omitted). The Border Patrol returned him to his ship without informing him of UABA's offer to help him seek political asylum. *Id.* On appeal, the government asserted that the case was moot because Medvid had left the United States, and thus there was no longer any subject matter over which to dispute. *Id.* at 1377. The court disagreed:

> That the particular situation that precipitated the constitutional challenge to the Government's policy is no longer "live" is not determinative, however. The Government's failure to contest the existence of the alleged policy precludes it from prevailing in the argument that the controversy became moot once Medvid left the country; the complaint challenges the Government's policy, not merely the Government's handling of the Medvid incident.

*Id.* (internal citations omitted).

The circumstances here present an even stronger argument against mootness. Rather than merely failing to contest the existence of its policy of denying timely admittance of mentally incapacitated defendants, OSH acknowledges the policy and seeks to justify it by placing the responsibility with the county jails. In addition, although there is no indication in *Ukrainian–American Bar Ass'n* that there were ongoing cases like Medvid's at the time of trial, here the record shows that OSH's policy results in continually recurring delays in the transfer of mentally incapacitated criminal defendants to OSH.

In light of the undisputed facts in the record and OSH's burden in establishing mootness, we conclude that OAC has "a legally cognizable interest for which the courts can grant a remedy." *Alaska Ctr.*, 189 F.3d at 854.

## II. Validity of the Injunction on the Merits

OSH challenges the injunction entered against it on the merits. OSH argues that the district court violated principles of federalism when it determined that OSH,

rather than Oregon's counties, must provide timely treatment to incapacitated criminal defendants. OSH also argues that the district court erred in concluding that OSH violated due process and in requiring that criminal defendants be given mental health treatment within seven days of being declared unfit. Again, we address each argument in turn.

## A. Federalism

OSH argues that it is for the Oregon legislature, not the federal courts, to decide which entity within the Oregon state government must provide and pay for the treatment of mentally incapacitated criminal defendants. Furthermore, OSH argues, the Oregon legislature has already decided that the county jails must provide for such treatment until OSH has a bed available. On this basis, OSH concludes that the district court's injunction violates principles of federalism because it contravenes a decision within the exclusive province of the Oregon legislature.

 We need not address OSH's federalism argument, however, because it is premised on an interpretation of ORS § 161.370 that we have already rejected. Under Oregon law it is OSH, not counties, that has the duty to accept incapacitated defendants once they have been certified as such by a circuit court. The injunction is consistent with the legislative choice embodied in the statute, and thus with principles of federalism.

## B. Due Process Violations

The district court held that criminal defendants declared unfit to proceed to trial under ORS § 161.370 have the right under substantive and procedural due process to "reasonably timely transport to a treatment facility." OSH violates that right, the district court held, by failing to admit incapacitated criminal defendants within seven days of the issuance of the court order declaring them unfit. As we noted earlier, OSH does not dispute that mentally ill persons accused of a crime have due process rights that the state is obliged to honor. Nor does OSH seriously contest that jails are inferior to OSH in their ability to evaluate and treat mentally ill defendants, or that defendants denied needed care are harmed thereby. OSH argues, however, that (1) any alleged substantive due process violation must be measured by the deliberate indifference standard; (2) the district court failed to engage in the individualized assessment required by the deliberate indifference standard; and (3) under such an individualized assessment, OSH was not deliberately indifferent to the needs of any individual incapacitated criminal defendant.[10]

 In assessing the merits of OSH's due process arguments, we are mindful that by statute OSH is solely responsible

10. Beyond its argument that Oregon's counties, not OSH, are responsible for the treatment of incapacitated criminal defendants until OSH has a bed for them, OSH does not challenge the district court's determination that OSH violates the *procedural* due process rights of incapacitated criminal defendants when it fails to admit them in a timely manner. The district court concluded:

13. Persons unfit to proceed and held in county jails for more than a brief period suffer delays in receiving restorative treatment, which delays their return to competency, prolonging their criminal cases and making it difficult for their attorneys to learn from their clients about the crime or crimes charged, to identify witnesses, and to enter into plea negotiations. It also delays the statutorily mandated competency review (required to be held within 60 days of entering the hospital). Accordingly, defendants' procedures and practices also violate the procedural due process rights of persons found unfit to proceed.

These procedural due process violations further support the district court's injunction.

for the timely treatment of incapacitated criminal defendants so that they may become competent to stand trial. We are also mindful of the undisputed harms that incapacitated criminal defendants suffer when they spend weeks or months in jail waiting for transfer to OSH. These harms include the following: Although jails can sometimes provide treatment to stabilize a patient, they cannot restore a patient to competency. Thus, incarceration in a county jail delays an incapacitated criminal defendant's possible return to competency. The disciplinary system that jails use to control inmates is ineffective for, and possibly harmful to, incapacitated criminal defendants. Because of their unpredictable or disruptive behavior, they are often locked in their cells for 22 to 23 hours a day, which further exacerbates their mental illness. Incapacitated criminal defendants have a high risk of suicide, and the longer they are deprived of treatment, the greater the likelihood they will decompensate and suffer unduly. These and other undisputed harms, together with OSH's statutory mandate to provide timely restorative treatment, support our conclusion below that OSH's delay in admitting incapacitated criminal defendants violates their substantive due process rights.

First, we reject OSH's claim that the deliberate indifference standard governs the due process rights of incapacitated criminal defendants. Pretrial detainees, whether or not they have been declared unfit to proceed, have not been convicted of any crime. Therefore, constitutional questions regarding the conditions and circumstances of their confinement are properly addressed under the due process clause of the Fourteenth Amendment, rather than under the Eighth Amendment's protection against cruel and unusual punishment. *City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Bell v. Wolfish,* 441 U.S. 520, 535

& n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *see also Gibson v. County of Washoe,* 290 F.3d 1175, 1187 (9th Cir. 2002). In light of the Supreme Court's observation that the due process rights of pretrial detainees are "at least as great as the Eighth Amendment protections available to a convicted prisoner," *Revere,* 463 U.S. at 244, 103 S.Ct. 2979, we have recognized that, even though the pretrial detainees' rights arise under the Due Process Clause, the guarantees of the Eighth Amendment provide a *minimum standard of care* for determining their rights, including the rights to medical and psychiatric care. *Gibson,* 290 F.3d at 1187; *Carnell v. Grimm,* 74 F.3d 977, 979 (9th Cir.1996); *Jones v. Johnson,* 781 F.2d 769, 771 (9th Cir.1986).

OSH argues, based on *Jones* and its progeny, that deliberate indifference is the degree of fault that must be established before OSH can be held liable for violations of the due process rights of incapacitated criminal defendants. We disagree. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court stated that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 321–22, 102 S.Ct. 2452. To apply the deliberate indifference standard here would be to relegate incapacitated criminal defendants to the same level of treatment afforded to convicted prisoners, a result *Youngberg* rejected. *See id.* at 325, 102 S.Ct. 2452 (concluding that "the jury was erroneously instructed on the assumption that the proper standard of liability was that of the Eighth Amendment"); *see also Patten v. Nichols,* 274 F.3d 829, 838 (4th Cir.2001) ("Applying the deliberate indifference standard to [the plaintiff's] claim would be giving invol-

untarily committed patients the *same* treatment as that afforded to convicted prisoners, a result the *Youngberg* Court specifically condemned."); *Boring v. Kozakiewicz,* 833 F.2d 468, 472 (3d Cir.1987) ("To apply the Eighth Amendment standard to mentally retarded persons would be little short of barbarous."). Therefore, we hold that the substantive due process rights of incapacitated criminal defendants are not governed solely by the deliberate indifference standard.[11]

Rather than look to the protections of the Eighth Amendment for a guiding standard, we look instead to the Supreme Court's and our own substantive due process jurisprudence. Before determining and applying the appropriate standard for imposing liability, we identify the substantive due process rights at issue.

■ Incapacitated criminal defendants have liberty interests in freedom from incarceration and in restorative treatment. "The Supreme Court has recognized that an individual has a liberty interest in being free from incarceration absent a criminal conviction." *Oviatt ex rel. Waugh v. Pearce,* 954 F.2d 1470, 1474 (9th Cir.1992) (citing *Baker v. McCollan,* 443 U.S. 137, 144, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Because incapacitated criminal defendants have not been convicted of any crime, they have an interest in freedom from incarceration. They also have a liberty interest in receiving restorative treatment. We have held that civilly committed persons must be provided with mental health treatment that gives them "a realistic opportunity to be cured or improve the mental condition for which they were confined." *Sharp v. Weston,* 233 F.3d 1166, 1172 (9th Cir.2000)

(citing *Ohlinger v. Watson,* 652 F.2d 775, 779 (9th Cir.1980)). "Lack of funds, staff or facilities cannot justify the State's failure to provide [such persons] with [the] treatment necessary for rehabilitation." *Ohlinger,* 652 F.2d at 779. Notably, Oregon's statutory scheme for the identification and treatment of incapacitated criminal defendants recognizes and seeks to protect these liberty interests.

■ Whether the substantive due process rights of incapacitated criminal defendants have been violated must be determined by balancing their liberty interests in freedom from incarceration and in restorative treatment against the legitimate interests of the state. *See Youngberg,* 457 U.S. at 321, 102 S.Ct. 2452. We conclude that such a balance favors the mentally ill defendants awaiting trial.

Here, OSH has not advanced, nor do we discern, a legitimate state interest in keeping mentally incapacitated criminal defendants locked up in county jails for weeks or months. OSH's refusal to accept such defendants not only contravenes the legislature's statutory mandate that OSH provide them with restorative treatment, it also undermines the state's fundamental interest in bringing the accused to trial. *See Illinois v. Allen,* 397 U.S. 337, 347, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring) ("Constitutional power to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace."). While they are detained in jail, incapacitated criminal defendants do not receive care giving them a realistic opportunity of becoming competent to stand trial. We conclude that OSH violates the substantive

---

11. We do not thereby imply that the deliberate indifference standard is of no use in substantive due process analysis. Because deliberate indifference is a minimum standard of care in the substantive due process context, deliberate indifference toward the medical needs of pretrial detainees will always violate substantive due process. Our point here is to emphasize that substantive due process may demand more than a lack of deliberate indifference.

due process rights of incapacitated criminal defendants when it refuses to admit them in a timely manner.

We draw support for our conclusion from the Supreme Court's decision in *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), which held that, under the Due Process Clause,

> a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future.... Furthermore, even if it is determined that the defendant probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal.

In reaching that conclusion, the Court explained: "At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Id.* The Court declined "to prescribe arbitrary time limits" for the reasonable duration of pretrial commitment, but noted that "petitioner Jackson has now been confined for three and one-half years on a record that sufficiently establishes the lack of a substantial probability that he will ever be able to partici-

pate fully in a trial." *Id.* at 738–39, 92 S.Ct. 1845.

Although *Jackson* involved a pretrial commitment to a mental health facility for three and one-half years, rather than pretrial detention for several weeks or months in a county jail, the principles enunciated in *Jackson* apply to the case before us. Here, Oregon courts commit persons found unfit to proceed to the care of OSH in order for OSH to evaluate, treat and restore their mental health so that judicial proceedings may resume. *See* ORS § 161.370. As the district court found, only a mental hospital like OSH, not a county jail, can fulfill those purposes. Only OSH has the highly trained staff and other resources needed to identify and treat an incapacitated criminal defendant's mental illness. County jails are simply unable to provide restorative treatment, and the jails' disciplinary systems may exacerbate the defendants' mental illnesses. Holding incapacitated criminal defendants in jail for weeks or months violates their due process rights because the nature and duration of their incarceration bear no reasonable relation to the evaluative and restorative purposes for which courts commit those individuals.

 We conclude that OSH's significant, ongoing violations of substantive and procedural due process [12] are sufficient to support the district court's injunction.[13]

---

12. *See* note 9, *supra.*

13. We reject OSH's argument that the district court abused its discretion in imposing a seven-day time limit within which OSH must admit incapacitated criminal defendants. The record in this case regarding the purpose and mandate of the statute, as well as the harms caused by OSH's delays, supports imposition of a reasonably short time limit. The district court set the time limit at seven days based in part on the Oregon legislature's choice of that time limit in the now-superseded version of the relevant state statute. *See* ORS § 161.370(3) (1999). We conclude that

the district court did not abuse its discretion. *See Sharp*, 233 F.3d at 1173 (holding that we review the scope of injunctive relief for an abuse of discretion).

We also reject OSH's claim that the district court abused its discretion in imposing an injunction of state-wide scope. OSH argues that the plaintiffs proffered evidence covering jails in only seven of Oregon's 36 counties and that the district court's findings therefore do not extend to the jails in the other 29 counties. We conclude, however, that the district court's unchallenged findings establish a sufficiently pervasive, systemic and consistent pattern of injury to justify the state-wide sweep of

## CONCLUSION

We conclude that OAC has standing to bring suit and that OAC's claims are not moot. We also uphold the district court's injunction requiring OSH to admit mentally incapacitated criminal defendants within seven days of a judicial finding of incapacitation.[14]

The order of stay pending appeal is dissolved.

**AFFIRMED.**

the injunction. If OSH has evidence that one or more Oregon county jails can and will provide timely and adequate restorative treatment to incapacitated criminal defendants, OSH can seek a modification of the injunction from the district court.

Finally, we reject OSH's claim that the district court abused its discretion in denying OSH's motion to modify the injunction. OSH moved the district court to modify the injunction so that the seven-day period would begin to run from the date OSH *receives* a commitment order rather than the date the order is issued. OSH argues that it has no way to ensure that it will receive notice within seven days that a state court has issued a commitment order and that as a result, OSH could, through no fault of its own, miss the deadline and be found in violation of the injunction. We conclude that the district court did not abuse its discretion. *See Hook v. Ariz. Dep't of Corr.*, 107 F.3d 1397, 1402 (9th Cir.1997) (holding that we review for abuse of discretion a district court's ruling on a motion to modify an injunction). The interest of an incapacitated criminal defendant in obtaining timely treatment accrues at the moment that

defendant is declared unfit, not at the moment the fact of unfitness is communicated to OSH. There is no evidence in the record of delays in the communication of commitment orders from the state courts to OSH.

14. Because we uphold the injunction, we also reject OSH's claim that, under the holding of *Green v. Mansour*, 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985), the district court violated the Eleventh Amendment in concluding that OSH *in the past* has violated the due process rights of incapacitated criminal defendants. In *Green*, the Supreme Court held that where "[t]here is no claimed continuing violation of federal law, and therefore no occasion to issue an injunction," a declaratory judgment that the defendant violated federal law in the past is barred by the Eleventh Amendment, because the only useful purpose for such a judgment would be to serve as res judicata in a state court suit seeking retrospective damages. *Id.* at 73, 106 S.Ct. 423. The holding of *Green* is inapplicable here because there is a continuing violation of federal law for which a valid injunction has been issued.