IKUTA, Circuit Judge,
with whom ■O’SCANNLAIN, SILVERMAN, GRABER, and CALLAHAN, Circuit Judges, join, dissenting:
Far removed from the potential dangers of a trial court, the majority holds that criminal defendants whose cases are now moot can use their individual appeals as vehicles to invalidate the prospective application of a federal district court’s policy of deferring to the United States Marshals Service on questions of courtroom security. In reaching this conclusion, the majority ignores Article Ill’s limitations on federal judicial power, conjures up an unsupported and unprecedented exception to mootness, chastises district judges for following our case law, brushes aside inconvenient Supreme Court reasoning, creates an unjustifiable circuit split, and discovers a one-size-fits-all courtroom security policy in the Constitution. We should not be hearing this case at all, much less using it to announce a sweeping and unfounded new constitutional rule with potentially grave consequences for state and federal courthouses throughout this circuit. I dissent.
I
In July 2013, the United States Marshals Service, pursuant to its congressional charge “to provide for the security ... of *667 the United States District Courts,” 28 U.S.C. § 566(a), recommended that the judges of the Southern District of California allow the Marshals Service to produce all in-custody defendants in full restraints for non-jury proceedings. The Marshals Service based this recommendation on several factors. For one, a number of dangerous incidents had recently occurred in the courthouse. In 2013 alone, there were two separate inmate-on-inmate assaults inside courtrooms; an inmate was stabbed in the face as a result of one of those assaults. The Marshals Service also discovered that several detainees had armed themselves with homemade weapons in holding cells, including a detainee with no violent background who attempted to smuggle a razor blade in his shoe.
Second, the Marshals Service determined that it lacked sufficient information to predict which detainees would present a danger. In many cases, detainees with no history of violence, or those who were charged with non-violent offenses, engaged in violent acts while in custody. For instance, in 2013 there were seven detainee-on-staff assaults in the Southern District of California; six of the offenders had been charged with non-violent offenses, and five of those six had no histories of violence. Moreover, the Marshals Service can access only limited criminal background information regarding detainees who are not residents of the United States, and the Southern District of California hears an unusually high number of eases involving such detainees. Accordingly, the Marshals Service concluded that it had little ability to predict which detainees would present a danger.
The Marshals Service also noted logistical concerns that enhanced the potential danger arising from the large number of criminal defendants cycling through the courthouse. In the years leading up to the policy’s implementation, the Marshals Service produced approximately 40,000 in-custody defendants for court appearances, with an average of over 200 defendants moving through district cellblocks per day. The high volume of in-custody criminal defendants, the close quarters in the courtrooms used by magistrate judges, the configurations of the courtrooms used by district judges, and budgetary constraints that forced the Marshals Service to reduce the allocation of resources to courtroom protection duties all contributed to heightened security concerns. In short, the Marshals Service’s security recommendation arose from a confluence of factors, many of which were specific to the Southern District of California.
After consulting with the United States Attorney’s Office, the Federal Defenders of San Diego, and a Criminal Justice Act panel representative, the district court concluded that it should defer to the Marshals Service’s recommendation on this courtroom security issue, with two exceptions. First, the district court declined to adopt the Marshals Service’s recommendation with respect to guilty plea colloquies and sentencing hearings. Second, the district court reserved the right of any individual judge to opt out of the policy. In deciding to implement the Marshals Service’s recommendation, the district court relied on our decision in United States v. Howard, 480 F.3d 1005, 1013 (9th Cir. 2007), and on the Second Circuit’s decision in United States v. Zuber, 118 F.3d 101, 104 (2d Cir. 1997), each of which held that deference to the Marshals Service’s judgment regarding the use of restraints on detainees during non-jury pretrial proceedings did not violate the detainees’ constitutional rights.
Challenges to the new policy came quickly, including from the defendants now before us on appeal. In October 2013, Jas- *668 min Morales made her initial appearance before a magistrate judge in full restraints pursuant to the new security policy. Morales had been charged with felony importation of a controlled substance, in violation of 21 U.S.C. §§ 952 and 960. Her counsel moved to have the restraints removed during the pretrial proceedings, but the magistrate judge denied the motion. While her criminal case was moving forward, Morales filed an emergency motion with the district court challenging the pretrial restraint policy. A district court judge denied that motion, and her counsel filed a notice of appeal in November 2013. A few months later, in April 2014, Morales pleaded guilty. The district court imposed a sentence of eighteen months imprisonment and three years of supervised release and entered a final judgment on June 19, 2014. At that point, Morales’s criminal case before the district court was over.[1] The other defendants whose appeals are before us— Rene Sanchez-Gomez, Moisés Patricio-Guzman, and Mark Ring — have similar stories.[2]
This case accordingly comes to us in an odd procedural posture: Each of the four defendants’ criminal cases came to a close before we heard their appeals, and the four defendants (represented here by the Federal Defenders of San Diego) are before us challenging only the Marshals Service’s prospective use of restraints during pretrial proceedings. They do not seek review of the individual decisions to permit the use of restraints in their cases. They do not seek damages for any injury they incurred due to this policy. Nor do they seek to have their convictions or sentences set aside as a result of any prejudicial effect of the restraint policy. Instead, the Federal Defenders of San Diego, allegedly on behalf of the four defendants, seeks prospective relief for all future pretrial detainees who may have pretrial proceedings in the Southern District of California. The defendants seek this relief even though, as the majority concedes, Maj. op. at 657-58, they are no longer subject to the challenged policy. In fact, none of these defendants has any reason to step foot in a federal courtroom as a pretrial detainee again. Thus, as the majority acknowledges, these defendants “are making class-like claims and asking for class-like relief,” Maj. op. at 655, but are doing so via their individual criminal cases. The threshold question presented in this case is *669 whether, consistent with Article III of the Constitution, they may do so.
II
Because Morales, Sanchez-Gomez, Patri-cio-Guzman, and Ring have no ongoing interest in the purely prospective relief they seek, see Maj. op. at 657-58, their appeals are moot unless some exception to the ordinary rules of mootness applies. But neither the Supreme Court nor our precedent has established any applicable exception. The majority implicitly concedes as much by contriving a new exception — the “functional class action,” id. at 657-58 — in order to rescue these appeals from mootness. Because this theory is inconsistent with Supreme Court precedent and incompatible with Article Ill’s case-or-controversy requirement, the majority’s creative effort to sidestep mootness should be rejected.
A
The majority treats Article Ill’s ease-or-controversy requirement as a mere obstacle in its path to the merits that can be avoided through calculated maneuvering. But our adherence to this requirement “is essential if federal courts are to function within their constitutional sphere of authority.” North Carolina v. Rice, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) (per curiam). The Constitution constrains federal “judicial Power” to nine classes of “Cases” and “Controversies.” U.S. Const, art. Ill, § 2; Rice, 404 U.S. at 246, 92 S.Ct. 402. A dispute is not a qualifying case or controversy unless we can afford relief to the parties before us, see Rice, 404 U.S. at 246, 92 S.Ct. 402, and the “ease-or-controversy requirement subsists through all stages of federal judicial proceedings,” Fed. Election Comm’n v. Wis. Right to Life, Inc., 551 U.S. 449, 461, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) (internal quotation marks omitted). Thus, “it is not enough that a dispute was very much alive when suit was filed.” Lewis v. Cont’l Bank Corp., 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990). Instead, if a party seeking relief loses a “cognizable interest in the outcome” at any stage of the litigation, Murphy v. Hunt, 455 U.S. 478, 481, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (per curiam) (internal quotation marks omitted), then the matter becomes moot and is “no longer a ‘Case’ or ‘Controversy’ for purposes of Article III, ... [n]o matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit,” Already, LLC v. Nike, Inc., 568 U.S. 85, 133 S.Ct. 721, 726-27, 184 L.Ed.2d 553 (2013). This constraint on federal judicial power exists, as .the majority acknowledges, whether the parties are before the court on an appeal, a petition for a writ of mandamus, or any other means of obtaining relief. Maj. op. at 657-58. Here, the defendants’ claims that the pretrial restraint policy violates the Constitution are moot “because even a favorable decision” would not entitle the defendants to any relief. Murphy, 455 U.S. at 481, 102 S.Ct. 1181. Accordingly, absent some exception to the ordinary rules of mootness, we lack jurisdiction over these consolidated appeals, and they must be dismissed.
The established exceptions to mootness do not give the majority much to work with in its effort to find a live case or controversy. The majority references the exception for cases capable of repetition, yet evading review, Maj. op. at 657-58, but this exception applies only if “there is a reasonable expectation that the same complaining party will be subject to the same action again,” Spencer v. Kemna, 523 U.S. 1, 17, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (brackets omitted) (quoting Lewis, 494 U.S. at 481, 110 S.Ct. 1249) (inter *670 nal alterations omitted). Here, as the majority concedes, “we cannot presume that defendants will be subject to criminal proceedings in the future.” Maj. op. at 657; accord O’Shea v. Littleton, 414 U.S. 488, 497, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); Cox v. McCarthy, 829 F.2d 800, 804 n.3 (9th Cir. 1987). Accordingly, the alleged injury is not capable of repetition as to the parties before us, and the “capable of repetition, yet evading review” exception to mootness is inapplicable. Spencer, 523 U.S. at 17, 118 S.Ct. 978.
B
Instead of conceding that this case is beyond our power to decide, the majority invents a new “functional class action” exception to mootness. Maj. op. at 657-60. Relying on Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), a case considering mootness in the class action context, the majority reasons that a case is not moot whenever there is “an ever-refilling but short-lived class” of defendants who are subject to a challenged policy, “[a]t least some members of this functional class continue to suffer the complained-of injury,” and most of the members are represented by zealous advocates. Maj. op. at 659. But a group of ever-changing individuals with similar concerns (as the majority envisions) does not constitute the sort of class that can avoid mootness. Even when a plaintiff purports to bring an action on behalf of others, the action will become moot when the plaintiffs own claims become moot, unless the plaintiff has used a procedural mechanism, such as class certification under Rule 23 of the Federal Rules of Civil Procedure, that can produce a class with “an independent legal status” or otherwise effectively joins “additional parties to the action.” Genesis Healthcare Corp. v. Symczyk, — U.S. -, 133 S.Ct. 1523, 1530, 185 L.Ed.2d 636 (2013). Without the creation of such a class pursuant to a statute or rule, a group of interested individuals cannot be a party to the action before the court, and therefore the court may not consider their interests in a particular case for purposes of a mootness inquiry. See id.
To understand why Gerstein is inappo-site here, some background is needed to explain how the mootness doctrine applies in the class action context. Rule 23 provides a procedure that allows courts to aggregate the claims of multiple parties. See Deposit Guar. Nat’l Bank v. Roper, 445 U.S. 326, 339, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980) (stating that a class action is “[t]he aggregation of individual claims in the context of a classwide suit”). Once a class is certified under Rule 23, it “acquires an independent legal status.” Genesis Healthcare, 133 S.Ct. at 1530. The members of a class are parties to the action and are generally bound by the judgment. See Taylor v. Sturgell, 553 U.S. 880, 884, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008).
Because a class is comprised of multiple parties to the legal action, a court’s mootness inquiry in a class action lawsuit is broader than in traditional litigation on an individual’s own behalf. See, e.g., Franks v. Bowman Transp. Co., 424 U.S. 747, 755-56, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) (holding that the interests of “unnamed members of the class” who are entitled to relief may satisfy the case-or-controversy requirement). The named representative of a class must generally have standing at the commencement of an action and when the district court rules on a motion for class certification. Sosna v. Iowa, 419 U.S. 393, 402, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). But even if the named representative’s case becomes moot after the district court has ruled on a motion for class certification, the case itself is not moot so long as *671 at least one member of the putative class has a live interest. See, e.g., id. (class action not moot when named representative’s claim becomes moot after class certification); U.S. Parole Comm’n v. Geraghty, 445 U.S. 388, 404, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) (class action not moot when named representative’s claim becomes moot after denial of class certification, provided that the class is subsequently certified). This makes sense: A certified class contains parties with ongoing live claims who have an entitlement to relief regardless whether the named representative’s case becomes moot after the complaint is filed. See Franks, 424 U.S. at 755-57, 96 S.Ct. 1251. Of course, if it turns out that the putative class was never actually eligible for certification, then the entire action dies as moot along with the class representative’s claim. Geraghty, 445 U.S. at 404, 100 S.Ct. 1202.
Even if a named representative’s claims become moot before the district court has ruled on a class certification motion, a class claim may escape mootness under certain circumstances. This is the Gerstein rule. As the Supreme Court has explained, Gerstein “recognized ... that ‘some claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative’s individual interest expires.’ ” County of Riverside v. McLaughlin, 500 U.S. 44, 52, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (brackets omitted) (quoting Geraghty, 445 U.S. at 399, 100 S.Ct. 1202). Under these circumstances, a judicial decision to certify a class after the named representative’s individual claim is moot may relate back to the time the named representative filed the class-action complaint, and the action will not be moot so long as members of the class continue to have a live controversy. See Gerstein, 420 U.S. at 110 n.11, 95 S.Ct. 854 (citing Sosna, 419 U.S. at 402 n.11, 95 S.Ct. 553).
In Gerstein, two pretrial detainees sued assorted county officials on behalf of. a class of pretrial detainees under 42 U.S.C. § 1983 in order to challenge Florida’s practice of not providing detainees with a timely probable cause hearing. Id. at 106—07, 95 S.Ct. 854. By the time the case reached the Supreme Court, the named representatives had been convicted, and it was not clear whether their individual claims had become moot before or after the district court certified the class. Id. at 110 n.11, 95 S.Ct. 854. Given the transitory nature of pretrial custody, the clear existence of a class, and the class’s representation by counsel with similarly situated clients, the Supreme Court held that the class action was not moot even if the named representatives’ claims expired before certification. Id. “In such cases, the ‘relation back’ doctrine is properly invoked to preserve the merits of the case for judicial resolution.” McLaughlin, 500 U.S. at 52, 111 S.Ct. 1661. As Gerstein illustrates, the “relation back” doctrine serves a very particular purpose. Specifically, in inherently transitory situations, the Court deems class certification to have occurred at the time the named representative filed the complaint with class allegations, at which time the named representative’s claims were live. See 1 William B. Rubenstein et al., Newberg on Class Actions § 2:13 at 123 (5th ed. 2011). Because the named representative’s claims therefore constructively became moot after the class’s certification, the rule that a class action does not become moot in such circumstances applies. See id. at 123-24.
The Supreme Court later explained the limits of the Rule 23 mootness doctrine in considering its applicability to a collective action under the Fair Labor Standards Act (FLSA). The FLSA allows employees to *672 bring a collective action on behalf of “other employees similarly situated,” but employees do not become parties to the action unless they elect to opt .into it. 29 U.S.C. § 216(b). In Genesis Healthcare, the named plaintiffs case became moot before the district court had “conditionally certified” the action,[3] so no other employees had yet opted into the collective action. 133 S.Ct. at 1530. The district court therefore dismissed the lawsuit as moot. Id. at 1527. The Third Circuit .reversed, holding that the collective action was not moot because, if the employee were subsequently successful in obtaining conditional certification, the district court should “relate the certification motion back to the dat,e on which respondent filed her complaint.” Id. at 1528.
The Supreme Court disagreed. Under § 216(b), approval of a plaintiffs conditional certification motion “does not produce a class with an independent legal status, or join additional parties to the action,” unlike class action certification under Rule 23. Id-at 1530. Rather, “[t]he sole consequence of conditional certification is the sending of court-approved written notice to employees, who in turn become parties to a collective action only by filing written consent with the court.” Id. (citation omitted). The Court concluded that, even if the original plaintiff “were to secure a conditional certification ruling on remand, nothing in that ruling would preserve her suit from mootness.” Id. In other words, because no claimants had opted into the collective action, a court could not consider their interests in determining whether, the plaintiffs suit was moot.
Relying on Gerstein, the plaintiff in Genesis Healthcare argued that in “inherently transitory” cases, a court could give the plaintiff an opportunity to complete the § 216(b) collective action process. Id. at 1530-31. If the court granted the conditional certification and employees subsequently joined the collective action, the plaintiff argued, the court should then “relate back” this successful creation of a collective action to the date the original plaintiff filed the complaint. Id. The Court did not rule on this suggestion, however, because the plaintiffs action in that case was not transitory in nature. Id. at 1531.[4] But even this argument rested on the proposition that, at some point in time, multiple plaintiffs with live cases and controversies would be parties to the action before the court, which would overcome the mootness of the original plaintiffs claim.
As the Supreme Court’s cases make clear, a necessary prerequisite to applying the mootness doctrine applicable to Rule 23 class actions is the existence of a procedural mechanism, such as Rule 23 or perhaps § 216(b), that allows a court to aggregate the claims of multiple potential claimants and make them parties to the legal action. See id. at 1530 (stating that the “essential” aspect of Sosna and its progeny “was the fact that a putative class action acquires an independent legal status once it is certified”). Contrary to the ma- *673 Jonty’s “functional class action” theory, it is not enough for a party to assert an inherently transitory claim on behalf of others; there must be a statutory or procedural mechanism that aggregates their claims before the court. See id. (characterizing the “line of cases” of which Gerstein is a part as applying to “an ‘inherently transitory’ class-action claim,” not to all inherently transitory claims). Indeed, the Supreme Court has never suggested that “unjoined claimants” could prevent the named plaintiffs case from becoming moot. See id. at 1531. For example, even though a collective action under the FLSA shares certain features of a class action, the class action mootness rules cannot apply unless and until the collective action includes the interests of other employees who have joined the action. See id. at 1530.
The majority’s “functional class action” theory cannot create a class that has an independent legal status, whether under Rule 23 or otherwise. Nor does it have the effect of joining any additional criminal defendants as parties to this action. Accordingly, there are no parties before the court with a live case or controversy who could prevent the action from becoming moot. Gerstein merely allows a court that certifies a class to relate the existence of the class back to an earlier point in time, when a named party had a live claim. See id. at 1530-31. Because there is no class action counterpart in the Federal Rules of Criminal Procedure, nor an analogous means of aggregating multiple criminal defendants for class-wide resolution of common claims in the context of federal prosecutions, there is nothing a court can “relate back” after a criminal defendant’s individual claim becomes moot. Accordingly, we must apply “the usual rule that litigation is conducted by and on behalf of the individual named parties only.” Califano v. Yamasaki, 442 U.S. 682, 700-01, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). The majority’s reliance on Gerstein is therefore to no avail. Although criminal defendants could bring civil actions as a class under Rule 23, cf. Gerstein, 420 U.S. at 106-07, 95 S.Ct. 854, a defendant in a criminal prosecution cannot, through his or her individual case, represent and bind other criminal defendants.
The majority argues that “the rule in Gerstein doesn’t turn on the presence of a procedural device like Rule 23,” but instead is a free-floating means of “resolving] the problem of inherently transitory claims while ensuring there is a live controversy to which the court can provide relief.” Maj. op. at 658. To the extent the majority means that a federal court can decide a moot claim merely because it is transitory, the majority’s theory is clearly contrary to the Constitution’s case-or-controversy requirement. See Murphy, 455 U.S. at 481-82, 102 S.Ct. 1181 (holding, in a post-Gerstein case, that a pretrial detainee’s individual transitory claim became moot “once he was convicted”). Rather, the Supreme Court has been careful to require a live case or controversy pending before the court through a class action that aggregates the claims of multiple parties. See, e.g., Genesis Healthcare, 133 S.Ct. at 1530-31 (characterizing the “line of cases” of which Gerstein is a part as applying to “class-action claim[s]”); McLaughlin, 500 U.S. at 51-52, 111 S.Ct. 1661 (applying Gerstein and holding “that by obtaining class certification, plaintiffs preserved the merits of the controversy for our review” (emphasis added)); cf. Murphy, 455 U.S. at 481-84, 102 S.Ct. 1181 (implicitly rejecting the view expressed by the dissenting justice that, under Gerstein, “the formalities of class certification are unnecessary,” id. at 486 n.3, 102 S.Ct. 1181). A class action’s aggregation of claims solves the problem of inherently transitory claims because, as long as at least one member of the class *674 has a live claim, a, federal court will have jurisdiction to resolve it.
Accordingly, contrary to the majority’s contentions, the rules for mootness in the class action context do not apply to the separate actions brought by Morales, Sanchez-Gomez, Patricio-Guzman, and Ring. Indeed, the majority’s reasoning on this point is even weaker than the plaintiffs arguments in Genesis Healthcare. In that case the plaintiff at least made allegations pursuant to a federal statute that allowed collective action. Genesis Healthcare, 133 S.Ct. at 1527. Here, the criminal defendants did not seek any class or collective status, nor did the defendants even raise such an issue before the district court or to us. At best, one might suggest (as the majority does) that the presence of the Federal Defenders of San Diego as counsel binds the parties together. Maj. op. at 659. But not only do the federal public defenders lack the capacity to aggregate their clients’ claims into an independent class, Congress has also declined to allow federal public defenders to bring civil rights claims on behalf of criminal defendants. See 18 U.S.C. § 3006A(a) (limiting the scope of representation); id. § 3006A(g)(2)(A) (restricting federal public defenders from “engaging] in the private practice of law”). Beyond constituting a misapplication of Supreme Court precedent, the so-called “functional class action” devised by the majority allows the federal public defenders to make an end-run around this statutory limitation by bringing the functional equivalent of a civil rights class action under the guise of a criminal appeal, without ever meeting (or even attempting to meet) the requirements of Rule 23. Thus, the majority errs on all fronts: it contravenes the Constitution, a relevant federal statute, and federal procedural rules.[5]
In addition to its misplaced reliance on Gerstein to support its “functional class action” theory, the majority’s reliance on Oregon Advocacy Center v. Mink, 322 F.3d 1101 (9th Cir. 2003), and United States v. Howard, 480 F.3d 1005 (9th Cir. 2007), Maj. op. at 658, is equally erroneous. Oregon Advocacy Center stands for the unremarkable proposition that a federally authorized organization established to represent the rights of people with disabilities has associational standing to bring a challenge on behalf of mentally incapacitated defendants. 322 F.3d at 1116. That case was not moot because the organization was challenging an ongoing policy causing ongoing harm to the organization’s *675 constituents. Id. at 1118. There is no such organization in our case; rather, the only organization involved in this appeal, the federal public defenders, is precluded from bringing civil actions, see 18 U.S.C. § 3006A(a), (g)(2)(A), a stark contrast to the organization in Oregon Advocacy Center, which Congress had authorized to bring such lawsuits. 322 F.3d at 1113.
Nor does Howard provide support. Howard erroneously relied on Oregon Advocacy Center for the proposition that a case is not moot under the “capable of repetition, yet evading review” doctrine “when the defendants are challenging an ongoing government policy.”[6] 480 F.3d at 1010. As explained above, this is an erroneous reading of the case, which involved associational standing. Moreover, Howard’s ruling is contrary to Supreme Court precedent, which limits the “capable of repetition, yet evading review” exception to cases in which there is “a reasonable expectation that the same complaining party will be subject to the same action again.”[7] Spencer, 523 U.S. at 17, 118 S.Ct. 978 (internal quotation marks and brackets omitted). The majority correctly acknowledges that this requirement is not met here. Maj. op. at 657-58. That acknowledgment should have ended this ease, not invited the majority’s “functional class action” theory.
In short, the criminal defendants here lack a legally cognizable interest in this appeal, and there is no reasonable expectation that they will be subject to the district court’s restraint policy again. Nor have these defendants brought a class action under Rule 23 that could be certified, or any equivalent action that produces “a class with an independent legal status” or “join[s] additional parties to the action.” Genesis Healthcare, 133 S.Ct. at 1530. We cannot create jurisdiction where none exists, but that is precisely what the majority has attempted to do with its novel and unfounded “functional class action” theory. Because there is no pretrial detainee with a live case who is a party to this appeal, this case must be dismissed as moot.
Although this appeal should be dismissed, the district court’s policy is not insulated entirely from judicial review. For example, we likely would have jurisdiction over a class action brought by pretrial detainees under Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), to recover damages from the individuals implementing the restraint policy,[8] or to seek to enjoin the United States Marshal for the district from carrying out the policy. Cf., e.g., Armstrong v. Exceptional Child Ctr., Inc., — U.S. -, 135 S.Ct. 1378, 1384, *676 191 L.Ed.2d 471 (2015) (noting that federal courts have long had the equitable power to enjoin unlawful conduct by federal officers); Shields v. Utah Idaho Cent. R.R. Co., 305 U.S. 177, 183, 59 S.Ct. 160, 83 L.Ed. 111 (1938) (similar); see also 5 U.S.C. § 702 (waiving sovereign immunity for such claims). Alternatively, the Ninth Circuit could exercise its supervisory powers by issuing appropriate guidance through the judicial council of the circuit. See 28 U.S.C. § 332(d)(1). It is unfortunate that the majority does not deem these procedurally sound avenues of redress even worthy of mention.
Ill
Because each of the defendants’ appeals is moot, it is irrelevant whether their appeals are treated as petitions for a writ of mandamus, as the majority does, Maj. op. at 655-57, or as appeals of collateral orders. In either case, we lack jurisdiction under Article III to consider their claims.
Nevertheless, even if this case were not moot, the defendants’ appeals do not meet the requirements for granting a writ of supervisory mandamus, as the majority claims. Maj. op. at 656. Even when “the underlying proceeding is a criminal prosecution,” the writ may issue only when a district court has engaged in “willful disobedience of the rules, laid down by” the Supreme Court, or “adopted a deliberate policy in open defiance of the federal rules.” Will v. United States, 389 U.S. 90, 96, 100, 102, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967). Only such “exceptional circumstances amounting to a judicial ‘usurpation of power’ will justify the invocation of this extraordinary remedy.” Id. at 95, 88 S.Ct. 269.[9]
In this case, the district court has not defied a higher court or the federal rules of procedure. Rather, the district court complied with our last word on the matter, Howard, 480 F.3d at 1012-14, in which we held that restraining pretrial detainees in proceedings before a judge did not violate due process. The majority therefore oddly equates a good faith effort to follow orn-ease law with “a persistent disregard” for our rulings. Will, 389 U.S. at 96, 88 S.Ct. 269. The majority attempts to distinguish Howard on the ground that the restraints in that case were not as intrusive as the restraints employed under the district court’s policy now under review. Maj. op. at 656-57 n.6. No doubt the majority has detected a factual distinction between Howard and this case, but the district court’s failure to anticipate such a distinction (which in any event does not appear to be constitutionally material) is a far cry from “willful disobedience” or “open defiance.” Will, 389 U.S. at 100, 102, 88 S.Ct. 269. As in Will, “the most that can be claimed on this record is that [the district court] may have erred in ruling on matters within [its] jurisdiction.” Id. at 103-04, 88 S.Ct. 269. The record here “simply fails to demonstrate the necessity for the drastic remedy employed by” the majority. Id. at 104, 88 S.Ct. 269.
IV
Because the individual appeals brought by Morales, Sanchez-Gomez, Patricio-Guz-man, and Ring are moot, we should not *677 rule on the merits of their arguments that pretrial detainees have a due process right to be free of bodily restraints in pretrial hearings before only a judge. Nevertheless, after proceeding to address the merits, the majority announces a new rule of constitutional criminal procedure that is contrary to Supreme Court precedent, creates a split with the Second and Eleventh Circuits, and puts trial courts throughout this circuit at risk. These errors warrant brief mention.[10]
'A
The question presented on the merits is whether the Constitution precludes placing restraints on detainees during pretrial proceedings before a judge in the absence of a special need. The majority analyzes this question under Deck v. Missouri, in which the Supreme Court considered “whether shackling a convicted offender during the penalty phase of a capital case violates the Federal Constitution.” 544 U.S. 622, 624, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005). Deck determined that a rule precluding the “routine use of visible shackles during the guilt phase” had “deep roots in the common law.” Id. at 626, 125 S.Ct. 2007. In reaching this conclusion, Deck considered treatises on the common law, 18th century English cases, state and federal court opinions adhering to the common law rule, and the Court’s own prior cases. Id. at 626-29, 125 S.Ct. 2007. From these authorities, Deck concluded that the rule against using visible shackles before a jury was “a principle deeply embedded in the law” and enshrined in the protections of the Fifth and Fourteenth Amendments. Id. at 629, 125 S.Ct. 2007. Ultimately, Deck held that “[t]he considerations that militate against the routine use of visible shackles during the guilt phase of a criminal trial apply with like force to penalty proceedings in capital cases.” Id. at 632, 125 S.Ct. 2007. In light of a defendant’s right to secure a meaningful defense, the need to maintain dignified proceedings, and the concern that visible restraints had the potential to prejudice the jury, the Court concluded that “courts cannot routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital .proceeding.” Id. at 632-33, 125 S.Ct. 2007.
If we apply Deck to the merits question here, we should begin by asking whether the common law rule identified in Deck extends to placing restraints on detainees during pretrial proceedings where there is no jury. Deck itself answers that question: “Blackstone and other English authorities recognized that the rule did not apply at ‘the time of arraignment,’ or like proceedings before the judge.” Id. at 626, 125 S.Ct. 2007 (quoting 4 W. Blackstone, Commentaries on the Laws of England 317 (1769) and citing Trial of Christopher Layer, 16 How. St. Tr. 94, 99 (K.B. 1722) (Layer’s Case)). Instead, Deck explained that the rule “was meant to protect defendants appearing at trial before a jury.” Id. (citing King v. Waite, 1 Leach 28, 36, 168 Eng. Rep. 117, 120 (K.B. 1743)). In other words, there is no rule regarding restraints on pretrial detainees in non-jury *678 proceedings that has “deep roots in the common law.” Id.
The majority dismisses this conclusion as “undoubtedly dictum” and “contradicted by the very sources on which the Supreme Court relied.” Maj. op. at 663. These rationalizations do not hold water.
First, Deck’s statement that the common law rule regulating shackling did not apply at arraignments is not mere dictum, as it responds to arguments raised by the dissent about the rule’s scope and purpose. Justice Thomas’s dissent argued that the purpose of the English common law rule against leaving a criminal defendant in irons for trial was to ensure that the defendant “was not so distracted by physical pain during his trial that he could not defend himself,” and accordingly modern restraints (which do not cause pain) “do not violate the principle animating the common-law rule.” Deck, 544 U.S. at 638, 640, 125 S.Ct. 2007 (Thomas, J., dissenting). To support this point, Justice Thomas noted that because a defendant was not required to “play the main role in defending himself’ at the arraignment, courts were not concerned about a defendant’s being distracted by pain. Id. at 639-40, 125 S.Ct. 2007 (Thomas, J., dissenting). Therefore, “the rule against shackling did not extend to arraignment.” Id. at 639, 125 S.Ct. 2007 (Thomas, J., dissenting). In its analysis, the Deck majority conceded the dissent’s historical point regarding shackling at arraignments, id. at 626, 125 S.Ct. 2007 (majority opinion), but responded that although “[jjudicial hostility to shackling may once primarily have reflected concern for the suffering,” current opinions “have not stressed the need to prevent physical suffering,” but have looked at other legal principles, id. at 630, 125 S.Ct. 2007. In light of this implicit give- and-take between the Deck majority and dissent, it is apparent that Deck’s conclusion regarding shackling during arraignments is a considered concession of the dissent’s historical point. Contrary to the majority, Maj. op. at 662 n.ll, Deck’s responsive historical analysis is part of its holding, as it bears on Deck’s delineation of the scope of the common law rule that constitutes due process under the Constitution. But even if Deck’s guidance were dicta, the majority’s rejection of the Supreme Court’s clear conclusion is contrary to our long established precedent that “Supreme Court dicta have a weight that is greater than ordinary judicial dicta” and therefore “we do not blandly shrug them off.” United States v. Montero-Camargo, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (en banc) (internal quotation marks omitted).
Second, Deck’s determination on this issue is not contradicted by the historical sources, as the majority seems to believe. Maj. op. at 662-65. In reaching its conclusion that the common law rule applied when the defendant was in the presence of the jury, but not “at ‘the time of arraignment,’ or like proceedings before the judge,” Deck undertook an in-depth historical analysis, considering Blackstone’s Commentaries on the Laws of England, original sources setting forth the rule, see Layer’s Case, 16 How. St. Tr. at 99; Waite, 1 Leach at 36, and state court eases recognizing the distinction that Blackstone drew, see Parker v. Territory, 5 Ariz. 283, 52 P. 361 (1898); People v. Harrington, 42 Cal. 165 (1871). Deck, 544 U.S. at 626-27, 125 S.Ct. 2007. The majority claims that “Blackstone did not recognize that the rule against shackles didn’t apply at the time of arraignment or proceedings before a judge,” but that “[sjhackles at arraignment and pretrial proceedings are acceptable only in situations of escape or danger.” Maj. op. at 663 (emphasis omitted). This is incorrect: Blackstone acknowledged a distinction between arraignment and trial made in Layer’s Case. While Blackstone *679 stated the general rule that a prisoner “must be brought to the bar without irons, or any manner of shackles or bonds,” he then observed that “in Layer’s Case, A.D. 1722, a difference was taken between the time of arraignment, and the time of trial; and accordingly the prisoner stood at the bar in chains during the time of his arraignment.” [11] 5 William Blackstone & St. George Tucker, Blackstone’s Commentaries with Notes of Reference 322 (1803).
Moreover, the text of Layer’s Case better supports Blackstone’s analysis. "When announcing his decision to keep Layer fet- ’ tered during his arraignment, the Lord Chief Justice first rejected Layer’s reliance on Cranbume’s Case for the proposition that restraints were not permitted at arraignments. Layer, 16 How. St. Tr. at 100. Instead, the Lord Chief Justice ruled that Cranbume’s Case governed only those cases “when the party was called upon to plead, and was tried at the same time.” Id. The Lord Chief Justice then reasoned that the defendant should be free from chains when he comes to trial so he “should have the use of his reason, and all advantages to clear his innocence.” Id. In pretrial proceedings, however, “he is only called upon to plead by advice of his counsel” and is not to be tried, so there was no reason for “his chains to be taken' off this minute, and to be put on again the next,” when he is returned to confinement. Id. at 100-01. This passage supports Blackstone’s analysis, as well as that of the Deck majority and dissent; the concern was not with escape, but with the practicalities of removing restraints for a hearing of limited purpose and duration. See Deck, 544 U.S. at 626, 125 S.Ct. 2007; id. at 639 n.2, 125 S.Ct. 2007 (Thomas, J., dissenting) (“When arraignment and trial occurred on separate occasions, the defendant could be brought to his arraignment in irons.”).
After the decision in Layer’s Case, the same rule was stated in King v. Waite, in which “[t]he prisoner, at the time of his arraignment, desired that his irons might be taken off.” 1 Leach 28, 36 (K.B. 1743). The court informed him, however, that it “had no authority for that purpose until the Jury were charged to try him.” Id. So the prisoner pleaded guilty, “and being put upon his trial, the Court immediately ordered his fetters to be knocked off.” Id.
As the common law developed in this country, state courts and treatises interpreted Layer’s Case and other common law sources as Deck did, namely as distinguishing the use of restraints during an arraignment from their use during trial. In Lee v. State, for example, the Mississippi Supreme Court noted that Layer’s Case and Waite’s Case both distinguished between arraignment (where shackles were generally allowed) and trial (where shackles were not allowed except for good cause). 51 Miss. 566, 571 (1875). Lee interpreted the Lord Chief Justice’s references to Layer’s possible escape as relevant only to his decision to reject Layer’s motion to have his restraints removed while in confinement. According to Lee, the Lord Chief Justice was concerned that granting such a motion “might be an excuse to his keeper if he (the prisoner) should escape.” Id. And Lee concluded that the Lord Chief Justice permitted shackling at arraignment because “it would be to no purpose to insist on [unfettering] for so little a time as the prisoner now had to stand at the bar.” Id. Other state courts similarly recognized the distinction between arraignment and trial. See, e.g., State v. Temple, 194 Mo. 237, 92 S.W. 869, 872 (Mo. 1906) (noting that in Layer’s Case, “it was held that the prison *680 er might be brought ironed to the bar for arraignment, but that his shackles must be stricken off at the trial,” without reference to concerns regarding escape during proceedings); Rainey v. State, 20 Tex.App. 455, 472 (1886) (citing a treatise for the proposition that prisoners may not be shackled during trial, except in unusual cases, “[tjhough the rule at arraignment where only a plea is required is less strict”). Indeed, some state courts have interpreted Layer’s Case as establishing a new common law rule, in contradistinction to a prior common law rule that defendants were generally not shackled at arraignment. See, e.g., Harrington, 42 Cal. at 167 (“[P]rior to 1722, when a prisoner was arraigned, or appeared at the bar of a Court to plead, he was presented without manacles or bonds, unless there was evident danger of his escape.”); Parker, 5 Ariz. at 287, 52 P. 361 (same).[12]
Rather than follow Deck, Blackstone, and these early state decisions, the majority provides its own interpretation of Layer’s Case, arguing that the Lord Chief Justice held Layer in chains only because Layer had previously attempted to escape. Maj. op. at 663-64. As explained above, this is not a persuasive reading of the case.[13] But even if the majority’s interpretation of Layer’s Case were also plausible, a reasonable difference in interpretations supports (at most) a conclusion that the case is ambiguous, and we should not ignore the Supreme Court’s resolution of an ambiguous issue. Even less should we reprimand a district court through mandamus for failing to anticipate that we would do so.
Besides being ill-considered, the majority’s decision to ignore Supreme Court direction also creates a circuit split, again contrary to our precedent. See United States v. Gwaltney, 790 F.2d 1378, 1388 n.4 (9th Cir. 1986) (“Unnecessary conflicts among the circuits are to be avoided.”); see also United States v. Alexander, 287 F.3d 811, 820 (9th Cir. 2002) (“[Ajbsent a strong reason to do so, we will not create a direct conflict with other circuits.” (quoting United States v. Chavez-Vernaza, 844 F.2d 1368, 1374 (9th Cir. 1988))). In Zuber, the Second Circuit held that because juror bias “constitutes the paramount concern” in a physical restraint case, and because judges are assumed not to be prejudiced “by impermissible factors,” 118 F.3d at 104, it did not violate due process “for a trial judge (in the absence of the jury) to defer to the judgment of the U.S. Marshals Service without comment or extended colloquy” on the issue of restraints, id. at 103 n.2. Thus, the Second Circuit concluded that “the rule that courts may not *681 permit a party to a jury trial to appear in court in physical restraints without first conducting an independent evaluation of the need for these restraints does not apply in the context of a non-jury sentencing hearing.” Id. at 102. Reaching a similar conclusion, the Eleventh Circuit, after reviewing Deck, Blackstone, and Layer’s Case, held that “the rule against shackling pertains only to a jury trial” and “does not apply to a sentencing hearing before a district judge.” United States v. LaFond, 783 F.3d 1216, 1225 (11th Cir. 2015), cert. denied, — U.S. -, 136 S.Ct. 213, 193 L.Ed.2d 163 (2015). The logic of both Zu-ber and LaFond is, as the majority recognizes, directly contrary to the rule announced today. Maj. op. at 661 n.8.
Were we empowered to decide this case, we should join our sister circuits in following Deck’s, reading of the common law, rather than inventing a new right out of whole cloth. Deck establishes that there is no common law rule against the use of restraints during pretrial proceedings. 544 U.S. at 626, 125 S.Ct. 2007. Moreover, as indicated in Zuber, there is no danger that the presumption of innocence or the dignity of the courtroom is undermined in the eyes of the jury when pretrial detainees appear in restraints before a judge. 118 F.3d at 103 n.2. Nor have the defendants here indicated that the restraints used in their cases interfered with their ability to communicate with their lawyers or participate in their own defenses. Deck, 544 U.S. at 631, 125 S.Ct. 2007. The rule sought by the defendants has no pedigree, nor does it protect a well-established right. Accordingly, it cannot be “objectively, ‘deeply rooted in this Nation’s history and tradition,’ ” Washington v. Glucksberg, 521 U.S. 702, 720-21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (quoting Moore v. City of East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion)), such that the Due Process Clause requires it, contra Maj. op. at 662. The majority’s contrary conclusion grows not from the “deep roots” of the common law, Deck, 544 U.S. at 626, 125 S.Ct. 2007, but from the majority’s own hothouse.
B
Putting aside the majority’s mistreatment of Deck, the appropriate framework for resolving this claim is provided by Bell v. Wolfish. In Bell, pretrial detainees brought a class action to challenge the conditions of their confinement at a federal pretrial detention center. 441 U.S. 520, 523, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The district court granted sweeping relief, which the Second Circuit affirmed in large part. Id. at 523-24, 99 S.Ct. 1861. In reviewing this relief, the Supreme Court set up the framework for analyzing constitutional claims by pretrial detainees challenging their conditions of confinement. Because Deck by its terms does not apply to the situation presented here, Deck, 544 U.S. at 626, 125 S.Ct. 2007, we ought to apply the general framework for pretrial detention claims that Bell establishes.
Three of Bell’s principles bear mentioning in this ease. First, Bell teaches us that although “the presumption of innocence plays an important role in our criminal justice system!,] ... it has no application to a determination of the rights of a pretrial detainee during confinement before his trial has even begun.” 441 U.S. at 533, 99 S.Ct. 1861. Second, Bell instructs that pretrial detainment policies “are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.” Id. at 548, 99 S.Ct. 1861 (quoting Pell v. *682 Procunier, 417 U.S. 817, 827, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)). This is so even where the officials are “ ‘experts’ only by Act of Congress,” because pretrial detainment policies are “peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial.” Id. Finally, Bell holds that “[i]n evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, ... the proper inquiry is whether those conditions amount to punishment of the detainee.” Id. at 535, 99 S.Ct. 1861. Because the government’s authority to detain pending trial extends to its ability “to employ devices that are calculated to effectuate this detention,” id. at 537, 99 S.Ct. 1861, when confronted with a particular challenged condition, the question for a court is “whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose,” id. at 538, 99 S.Ct. 1861. In the absence of an intent to punish, a pretrial condition of confinement is not a “punishment” if it is “reasonably related to a legitimate governmental objective.” Id. at 539, 99 S.Ct. 1861. By contrast, where a condition is “arbitrary or purposeless,” a court may infer that the true purpose of the condition is to punish. Id.
The majority dismisses Bell as inapplicable because “Bell dealt with pretrial detention facilities, not courtrooms,” and detention facilities “are meant to'restrain and keep order, not dispense justice.” Maj. op. at 665. The majority acknowledges that Bell may apply beyond the detention facility walls, see Maj. op. at 665 n.15, but draws a hard line at the courtroom door, see Maj. op. at 665 n.14. Certainly under Deck, a pretrial detainee has additional due process rights when appearing before a jury. But pretrial detainees enjoy no heightened interests when they appear in court outside of the presence of a jury. Cf. Zuber, 118 F.3d at 103-04 & n.2. The government’s interest in securing their presence at trial and maintaining order and security, however, remains the same regardless of the location. Thus, as in Bell, the question is whether these interests justify the government’s restriction on the liberty of pretrial detainees.
As explained in Bell, the government may restrain detainees to ensure they will be available for trial, 441 U.S. at 539, 99 S.Ct. 1861, and may take certain steps necessary to “maintain security and order,” id. at 540, 99 S.Ct. 1861. Bell’s central lesson is that the reasonable pursuit of these objectives through restrictions on detainees’ liberty interests, without more, does not rise to a constitutional violation. Id. at 539, 99 S.Ct. 1861. This logic applies beyond the detention facility itself. For example, the government must often ensure that detainees appear at pretrial proceedings. See Fed. R. Crim. P. 10 (providing that a defendant must be physically present at arraignment absent an express waiver of his or her right to appear or express consent to video teleconferencing). But even when detainees are outside the walls of a particular detention facility, they are still subject to detention, and the government maintains a compelling interest in securing their ultimate presence for trial. Cf. Brothers v. Klevenhagen, 28 F.3d 452, 457 (5th Cir. 1994) (holding that pretrial detainee status “never reverts back” to a greater degree of protection “[ujntil the detainee is released from custody”). Thus, pretrial detainees remain detained while they are in a vehicle transporting them to and from the courthouse, in a holding cell in the courthouse, in any outdoor areas, and even in the courtroom itself. Cf. Beaulieu v. Ludeman, 690 F.3d 1017, 1031-33 (8th Cir. 2012) (upholding under Bell a policy of placing civilly committed detain *683 ees in full restraints whenever being transported). In each area, the detainee is subject to reasonable government control aimed at securing his or her presence at trial and his or her orderly and safe interaction with other detainees.
Viewed in this light, the merits of this case would not be difficult, were we empowered to reach it. Because the pretrial detainees are outside the presence of a jury, the majority’s rhetoric about the presumption of innocence, Maj. op. at 660-61, has no place in the analysis. Bell, 441 U.S. at 533, 99 S.Ct. 1861. Moreover, because there is no allegation that the restraint policy is intended as a punishment, the question is simply whether requiring detainees to wear restraints while attending their pretrial hearings “is reasonably related to a legitimate governmental objective.” Id. at 539, 99 S.Ct. 1861. Here, it clearly is. To the extent the restraints reduce the likelihood of an escape, they further the government’s interest in ensuring that detainees will appear at trial. See id. Similarly, given the history of detainee-related assaults and weapons smuggling in the Southern District of California, the restraints are reasonably related to the government’s interest in maintaining order and safety among its detainees. Cf. id. at 540, 99 S.Ct. 1861 (“[T]he Government must be able to take steps to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees.”). Requiring detainees to appear at pretrial hearings in restraints is therefore reasonably related to the government’s valid interests, and the policy is accordingly a constitutionally permissible condition of pretrial confinement. See id.
Making this case even simpler, the district court’s deference to the Marshals Service, the entity that Congress statutorily charged with providing courtroom security, 28 U.S.C. § 566(a), is consistent with the Marshals Service’s role as an expert entity charged with securing courtrooms and managing pretrial detainees during their court appearances. As the expert on courtroom security, the Marshals Service is due “wide-ranging deference” absent “substantial evidence in the record to indicate that the officials have exaggerated their response” to the problems they seek to solve. Bell, 441 U.S. at 547, 548, 99 S.Ct. 1861. Because there is no substantial evidence on this record that the Marshals Service is punishing detainees by restraining them or otherwise imposing conditions of confinement unrelated to the government’s legitimate interests, the challenged policy is not an unconstitutional condition of detention. Accordingly, the district court’s deference to the Marshals Service’s recommendation does not violate the pretrial detainees’ constitutional rights.
To be sure, “district courts have the inherent authority to manage their ... courtrooms,” Dietz v. Bouldin, — U.S. -, 136 S.Ct. 1885, 1892, 195 L.Ed.2d 161 (2016), and some may choose not to defer to the Marshals Service’s recommendation after a careful balancing of the need for safety and security of the courtrooms with the interests of the detainees. These are decisions, however, to be made by the district courts themselves, taking into account facts specific to their situations, including such factors as the adequacy of staffing by security professionals, the configurations of the courtrooms, and prior experiences. They are not decisions that should be made by appellate jurists far removed from the day-to-day administration of criminal justice.
By creating a blanket constitutional rule in this moot case, the majority not only puts federal district courts at risk, but also restricts the choices that states in this circuit can make to secure detainees with *684 out inviting a lawsuit under § 1983.[14] The ramifications of the majority’s holding will reach into courthouses of every size and capacity, yet the majority never once pauses to consider the consequences of its one-size-fits-all security decree. Indeed, the majority fails even to consider the evidence on this particular record that the Marshals Service is unable to make well-founded individual judgments about what threat, if any, a pretrial detainee poses. Instead, the majority lays down the rule that the Marshals Service can either do the impossible (predict risks based on a dearth of predictive information) or sit idly by and suffer an identifiable, compelling harm (violence in the courtroom). The majority’s rule therefore fails not only as a matter of law, but also as a matter of common sense.
V
The majority’s analysis is wrong at every turn. It contradicts the Supreme Court’s rulings on mootness, mandamus, and the merits, and it substitutes the supposed wisdom of the ivory tower for the expertise of the United States Marshals Service and the district courts themselves. Because the four defendants whose criminal appeals are before us have now long since passed through the federal criminal justice system, we should dismiss these appeals as moot, rather than use them as improper vehicles to make a constitutional ruling as sweeping as it is erroneous. I dissent.

. While Morales could appear in federal court again on a supervised release violation, she would not appear as a pretrial detainee. Rather, she is now "[a] criminal defendant proved guilty” who "does not have the same liberty interests as a free man.” Dist. Atty’s Office v. Osborne, 557 U.S. 52, 68, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009).

. Sanchez-Gomez was charged with felony misuse of a passport in violation of 18 U.S.C. § 1544. He filed an emergency motion (identical to Morales’s motion) challenging the restraint policy. The district court denied the motion, and Sanchez-Gomez filed a notice of appeal on November 22, 2013. By December 2013, Sanchez-Gomez had pleaded guilty to the charge; the district court entered a final judgment and imposed five years of probation. Patricio-Guzman filed an identical emergency motion challenging the restraint policy. It was also denied. He pleaded guilty to misdemeanor illegal entry into the United States, 8 U.S.C. § 1325, and was sentenced to' thirty days of imprisonment. Final judgment was entered in his case weeks before he filed a notice of appeal regarding the denial of his motion to have restraints removed during pretrial proceedings. Ring was charged with making an interstate threat in violation of 18 U.S.C. § 875(c). His challenge to the use of pretrial restraints was also denied in November 2013, and he filed an appeal a week later. The district court dismissed the charges against Ring with prejudice on the government’s motion in October 2014. We 'consolidated the appeals brought by each of the defendants.

. Genesis Healthcare explained that courts adopted class action terminology, such as "conditional certification,” in the FLSA context "to describe the process of joining co-plaintiffs under 29 U.S.C. § 216(b).” 133 S.Ct. at 1527 n.1.

. Because Genesis Healthcare rejected the plaintiff's argument on this ground, it provides no support for the majority's extension of the relation back doctrine to a criminal defendant’s claim within his or her criminal case. Contrary to the majority’s suggestion that the Court's silence equals permission, Maj. op. at 658-59, Genesis Healthcare consistently refers to the relation back doctrine as applying only to class actions. 133 S.Ct. at 1530-31.

. Contrary to the majority's argument, our "supervisory mandamus role” does not give us any authority to address moot claims. Maj. op. at 659. As the majority itself acknowledges, "[s]upervisoiy mandamus cases require live controversies even when we don’t order a lower court to take or refrain from a specific action.” Maj. op. at 657 (citing In re United States, 791 F.3d 945, 952 (9th Cir. 2015)). Indeed, each supervisory mandamus case that the majority cites involved a live Article III case or controversy. Will v. United States, 389 U.S. 90, 91, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967) (ongoing criminal prosecution for tax evasion); Schlagenhauf v. Holder, 379 U.S. 104, 106-09, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964) (ongoing diversity personal injury suit); La Buy v. Howes Leather Co., 352 U.S. 249, 251-54, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957) (ongoing antitrust suit). It is true that the Supreme Court’s decisions in these cases constituted binding precedent and therefore affected persons who were not before the court; this is the nature of our federal judicial system. But an opinion that “addresses the harm of a district court policy affecting a huge class of persons that aren’t parties to the mandamus petition” in a moot case is just an advisory opinion, Maj. op. at 659, and "[t]he federal courts established pursuant to Article III of the Constitution do not render advisory opinions,” Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969) (quoting United Public Workers of Am. (C.I.O.) v. Mitchell, 330 U.S. 75, 89, 67 S.Ct. 556, 91 L.Ed. 754 (1947)).

. Howard's reliance on a case from the D.C. Circuit for the same proposition is equally mistaken. See Howard, 480 F.3d at 1010 (citing Ukrainian-Am. Bar Ass’n v. Baker, 893 F.2d 1374, 1377 (D.C. Cir. 1990)). Like Oregon Advocacy Center, Ukrainian-American Bar Ass’n was a case in which an organization was suing in its own name to challenge an ongoing government policy. 893 F.2d at 1376-77. For that reason, Ukrainian-American Bar Ass’n was inapposite in Howard, as it is here.

. Howard’s treatment of the capable of repetition, yet evading review exception has been rightly criticized elsewhere. See Milwaukee Police Ass’n v. Bd. of Fire & Police Comm’rs, 708 F.3d 921, 932 (7th Cir. 2013) (noting that Howard and cases following it "shoehorned ongoing policy challenges” into the capable of repetition exception even though “the parties would not otherwise qualify for the exception as articulated doctrinally”). The en banc court should have used this case as a vehicle to overrule Howard’s error, not to entrench it further.

.This should not be read to suggest, however, either that a Bivens remedy would ultimately be appropriate, or that the government defendants would be unable to avail themselves of qualified immunity or other defenses.

. The majority suggests that because Will raised “concerns about speedy trials and double jeopardy” that are not present here, the mandamus principles discussed in Will are not applicable. Maj. op. at 656 n.5. But Will merely applied the Supreme Court’s general mandamus principles that are applicable in civil and criminal cases alike. See, e.g., La Buy, 352 U.S. at 257-58, 77 S.Ct. 309 (holding that supervisory mandamus "should be resorted to only in extreme cases” such as where "the Court of Appeals has for years admonished the trial judges” not to engage in a particular practice).

. Judge Schroeder’s concurrence faults the analysis that follows as "lack[ing] sensitivity to two of the most important components of our system of justice," the dignity of court proceedings and the proper role of judges in managing their courtrooms. Concurrence at 666. It is the majority, however, that "lacks sensitivity to the proper role of ... judges" in our constitutional system, id., by contravening the "minimum constitutional mandate” that "[t]he Art. Ill judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally," Warth v. Seldin, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

. William Hawkins noted this same distinction, also in reliance on Layer’s Case. 2 William Hawkins, A Treatise on the Pleas of the Crown 437 (1787).

. The majority makes the strange accusation that this analysis of state court cases is flawed because it "cites no secondary sources.” Maj. op. at 664 n.13. The primary sources cited here, however — actual judicial opinions — read Layer's Case as Blackstone and Deck read them. If secondary sources have derived a different rule, this again suggests, at most, that the common law is ambiguous. It is precisely because of this ambiguity that we should follow the Supreme Court’s interpretation in Deck, rather than adopt a contrary view that the Court has rejected.

. The majority contends that my interpretation of Layer's Case "struggles manfully against the plain language of Layer’s case and Blackstone.” Maj. op. at 664. Rather than struggling — manfully or otherwise — with Layer’s Case, I would merely follow the Supreme Court’s interpretation of Layer’s Case, which is well supported by the text and relevant primary and secondary sources. As noted above, the Court relied on Layer’s Case for the proposition that "Blackstone and other English authorities recognized that the rule [against shackling] did not apply at ‘the time of arraignment,' or like proceedings before the judge.” Deck, 544 U.S. at 626, 125 S.Ct. 2007. It is the majority that struggles to bypass the Supreme Court’s considered statement.

. State courtrooms may face even greater dangers than federal courthouses. “Federal judges are protected by a dedicated law enforcement agency, the U.S. Marshals Service,” but "[m]ost state and local judges are protected by all-purpose local sheriff or police departments.” Chuck Weller, What Judges Should Know about Court-Related Violence, 53 Judges’ J. 28, 30 (2014). Therefore, "[f]ew state and local judges will ever have the level of protection afforded to their federal counterparts.” Id. Indeed, a mere matter of months ago, a pretrial detainee in Michigan who was handcuffed, but not secured with a belt apparatus that the majority maligns, Maj. op. at 653, managed to disarm a sheriff's deputy, kill two bailiffs, shoot a bystander in the arm, and take hostages. See Associated Press, Sheriff: Inmate who killed 2 at Michigan courthouse was handcuffed, Chicago Tribune (July 12, 2016), available at http://www. chicagotribune.com/news/nationworld/ midwest/ct-michigan-courthouse-shooting-20160712-story .html.